*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0381P (6th Cir.)
File Name: 01a0381p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

EDWARD H. FLINT,
individually, as father, next of
kin, administrator and
personal representative of the
estate of Robert Flint,
     *Plaintiff-Appellee,*

     *v.*

KENTUCKY DEPARTMENT OF
CORRECTIONS; JACK C.
LEWIS, Commissioner,
Kentucky Department of
Corrections; DEWEY
SOWDERS, Deputy
Commissioner, Kentucky
Department of Corrections; C.
TONY WILLIAMS, Interim
Warden; MICHAEL WHISMAN;
TOMMY ELDRIDGE; RICHARD
GRAY; SUE MONTGOMERY, in
her capacity as guardian for
James H. Montgomery,
     *Defendants-Appellants,*

No. 00-5129

JAMES EDGAR UNDERWOOD;
JIM MONTGOMERY, Print
Shop Supervisor,
               *Defendants.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 96-00591—Jennifer B. Coffman, District Judge.

Argued:  June 13, 2001

Decided and Filed:  October 26, 2001

Before:  RYAN and COLE, Circuit Judges; MARBLEY,
District Judge.[*]

_____

**COUNSEL**

**ARGUED:**  Edward F. Busch, CONLIFFE, SANDMANN &
SULLIVAN, Louisville, Kentucky, for Appellants.  Michael
A. Valenti, VALENTI, HANLEY & CROOKS, Louisville,
Kentucky, for Appellee.  **ON BRIEF:**  Edward F. Busch,
Richard M. Sullivan, CONLIFFE, SANDMANN &
SULLIVAN, Louisville, Kentucky, for Appellants.  Michael
A. Valenti, Kevin P. Crooks, VALENTI, HANLEY &
CROOKS, Louisville, Kentucky, for Appellee.

_____

[*] The Honorable Algenon L. Marbley, United States District Judge for
the Southern District of Ohio, sitting by designation.

---

**OPINION**

---

ALGENON L. MARBLEY, District Judge.   The Defendants, Jack C. Lewis, Dewey Sowders, C. Tony Williams, Michael Whisman, Tommy Eldridge, Richard Gray and James Montgomery appeal the District Court's denial of summary judgment on the issue of qualified immunity.[1]  The Plaintiff, Edward H. Flint, the administrator and personal representative of the estate of Robert Flint, brought suit against the Defendants following his son's murder while Robert Flint was an inmate at Luther Luckett Correctional Complex ("LLCC").   In his amended complaint, brought pursuant to 42 U.S.C. § 1983, the Plaintiff alleged a deprivation of his constitutional rights under the Equal Protection Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution.[2]  The central issue before the Court is whether qualified immunity was properly denied by the District Court on the Plaintiff's Eighth Amendment cruel and unusual punishment claim.

For the following reasons, the District Court's opinion is **AFFIRMED**, and qualified immunity is **DENIED** to individually named Defendants Lewis, Sowders, Whisman, Eldridge, Gray, Williams and Montgomery.

---

[1] James Underwood, also a named Defendant and the inmate who murdered Flint, did not join in the underlying motion for summary judgment filed by the Defendants and was not named in the Notice of Appeal.

[2] In his response to the Defendants' motion for summary judgment, the Plaintiff abandoned his equal protection claim, his claims against the Department of Corrections and his claims against the Defendants in their official capacities.  In its opinion and order, the District Court dismissed the Plaintiff's official capacity and negligence claims, while his individual-capacity claims survived.

## I. BACKGROUND

### A. Facts

The facts presented are in the light most favorable to the non-movant Plaintiff, and are taken from the evidence, including the depositions, that were filed with the District Court as of January 5, 2000, the date of the District Court's opinion and order denying summary judgment.[3]

The Plaintiff, Edward H. Flint, brought suit on behalf of the estate of his son, Robert Flint ("Flint"). Flint was killed by James Underwood on October 5, 1995, while both individuals were inmates at LLCC. The named Defendants are as follows: Jack Lewis, Commissioner of the Kentucky Department of Corrections; Dewey Sowders, Deputy Commissioner; Tony Williams, Interim Warden of LLCC; Michael Whisman, temporary print shop Supervisor; Tommy Eldridge, temporary print shop Operations Manager; Richard Gray, Internal Affairs Officer, and James Montgomery, former print shop Operations Manager.

While at LLCC, Flint worked at the print shop. Inmates generally enjoyed working at the print shop because it was the highest-paying job available to them. Defendant Montgomery was the manager of the print shop. Montgomery, himself a former inmate, had what was characterized as a "close relationship" with several inmates, including Raymond Rust, Defendant Underwood and William Borsch.[4] Montgomery would allow inmates Rust, Underwood and Borsch to make telephone calls from his office in violation of prison rules. In July of 1995, Flint reported to prison officials that, from the print shop, Rust had called Montgomery at home while Montgomery was on vacation.

---

[3]The parties are in disagreement as to which depositions are properly before this Court, and which depositions were before the District Court when it issued its January 5, 2000 opinion. *See* Part III. B.

[4]Both Rust and Underwood had served time with Montgomery.

## IV. CONCLUSION

The District Court's denial of qualified immunity and of summary judgment is **AFFIRMED** and the case is **REMANDED** to the District Court for further proceedings.

*Farmer*, 511 U.S. at 834.[13]   The Court finds that it is without question that the right was clearly established at least one year prior to Flint's death.

### 3. Objective Reasonableness

Under the final prong of the test, the Court must "determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams*, 186 F.3d at 691.   The Court finds that the Defendants acted objectively unreasonable in light of *Farmer* and subsequent Eighth Amendment jurisprudence in failing to protect Flint from a substantial risk of harm presented by another inmate.   All of the Defendants were aware of the threat to Flint's life, yet based on the record before the Court, did nothing to protect him.   An objectively reasonable response to Montgomery and to Rust's threats, and to Edward Flint's and Representative Burch's phone calls, would have been to take some affirmative action to protect Flint's health and safety.   The Defendants, however, did not take *any* action, let alone reasonable action.   The Court, therefore, concludes that the Defendants acted objectively unreasonable under the third prong of the test for qualified immunity announced by *Williams*.

After examining all three elements, this Court finds that none of the individually-named Defendants is entitled to qualified immunity from the Plaintiff's Eighth Amendment cruel and unusual punishment claim.

---

[13]*See* Part III.D. (discussing elements of an Eighth Amendment cruel and unusual punishment claim).

Surmising that Flint reported Rust's phone calls, Montgomery terminated Flint's employment at the print shop on August 31, 1995, and in September of 1995, fabricated an incident report against Flint.[5]   Defendant Montgomery accused Flint of "ratting" on him and on Rust.   Montgomery told Flint that he would "fix it so that Flint would never go home."   Operations Lieutenant Fryberger, in his investigative report dated September 5, 1995, concluded that Montgomery filed the incident report against Flint in retaliation for his reporting the infractions of Montgomery and his inmate friends.   Defendants Sowders and Gray were given copies of Fryberger's report, and Defendant Gray knew that Montgomery threatened Flint when Montgomery told Flint that he was "going to get his."

Defendant Sowders assigned Gary Beckstrom and Philip Webb, Investigators at the Department of Corrections Central Office, to look further into Montgomery's activities at the print shop.   Montgomery was transferred from LLCC pending the investigation, and Defendant Eldridge became the new temporary print shop supervisor.   During the investigation, Flint was interviewed and disclosed Montgomery's misconduct, including the illegal phone calls, illegal print jobs and the falsification of time sheets.   Because of their unwillingness to cooperate with the investigation, Rust, Underwood and Borsch all lost their jobs at the print shop.

Also as a result of the investigation, Rust was placed in administrative segregation.   In a letter Rust wrote to Underwood from segregation, postmarked September 21, 1995, Rust blamed Flint for his detention and stated that Flint was "at the top of my list of things to do."   Prison officials obtained the letter and provided a copy to Defendant Gray, who turned the letter over to investigators Webb and Beckstrom.

---

[5]At the time, Flint was scheduled to be released from prison in December of 1995.   The incident report would have delayed his scheduled release date.

A week later Rust wrote a second letter to Underwood, stamped received on September 28, 1995, which also was intercepted by LLCC's Internal Affairs Office. In that letter, Rust wrote:

I blame Flint + Ernie for me being in here where I cant keep up with condition, and I want to kill them so bad, I dream about it. I know they aren't worth the time I would have to do for it, but one dark night we will meet again.

On September 20, 1995, Gray issued an order forbidding Borsch and Underwood from entering the print shop. The order was given "wide distribution" which included placing a copy of it in the print shop mailbox. In addition, Gray discussed the contents of the memorandum with Defendant Eldridge, telling him that Underwood and Borsch were not allowed in the print shop. Eldridge subsequently informed his staff, including Defendant Whisman, of the restriction. Eldridge knew that Underwood, Borsch and Rust all recently had lost their jobs at the print shop.

In late September, Flint called his father and told him that he was going to be killed. Edward Flint, in turn, contacted Defendants Sowders and Williams. Sowders and Williams both told Edward Flint that they were familiar with the situation and that an investigation was being conducted. That fall, following a call from Edward Flint, State Representative Tom Burch telephoned Defendant Lewis to inform him of the threat against Flint's life. Lewis initially told Burch that he would look into the matter and later informed him that the incident was under investigation.

In October of 1995, Defendant Eldridge was employed temporarily as the Operations Manager of the print shop because of the ongoing investigation. Defendant Gray called Eldridge when he first took the temporary position to tell him that Underwood would no longer be working in the print shop. On October 3, 1995, Underwood was informed that he would undergo "special reclassification." Long-time inmates understood that "special reclassification" meant being transferred to another prison.

that a risk to Flint's health and safety existed. Based on the precedent established by *Farmer*, this Court concludes that Defendants Lewis, Sowders and Williams have met the first prong of the test for qualified immunity as these Defendants violated the Cruel and Unusual Punishment Clause of the Eighth Amendment.

As to Defendants Montgomery, Gray, Eldridge, Lewis, Sowders and Williams, the Supreme Court's analysis in *Farmer* is instructive. The *Farmer* Court noted that the named-defendant need not know the actual identity of the "specific" individual who posed the risk to the plaintiff, but generally needed to be "aware of an obvious, substantial risk to inmate safety . . . ." *Id.* at 843. Here, all six of the Defendants knew of the threats to Flint's health and safety, regardless of the fact that they might not have surmised the identity of the individual who would ultimately kill him.

This Court, therefore, determines, under the first prong of the test for qualified immunity as established by *Williams*, that all of the Defendants committed a constitutional violation. The Defendants acted with deliberate indifference toward an excessive risk to Flint's health and safety, thereby violating the Cruel and Unusual Punishment Clause of the Eighth Amendment. The first prong of the test for qualified immunity has therefore been met.

### 2. Clearly Established Right

Turning to the second prong of the test, the Court must determine whether prison officials, as reasonable persons, would have known, as of October 4, 1995, the date of Flint's murder, that they were violating a clearly established right of Flint's. *Williams*, 186 F.3d at 691. In 1994, a year before Flint was murdered, the Supreme Court held that a prisoner may bring a claim against a prison official, based on harm perpetrated by a fellow inmate, if the prison official acted deliberately indifferent "to inmate health and safety."

with deliberate indifference and therefore committed an Eighth Amendment violation.

### e. Lewis, Sowders and Williams

Edward Flint and State Representative Burch called Defendant Lewis to tell him that Flint's life was in danger. Defendant Lewis informed Edward Flint that the matter was under investigation.

Defendant Sowders appointed Webb and Beckstrom to the Montgomery investigation and obtained a copy of the post-investigation report. The report documented the activities of Montgomery, Rust, Underwood and Borsch and also contained a summary of Flint's involvement in the investigation. Sowders's investigators, Webb and Beckstrom, also received a copy of Rust's letters threatening Flint's life.

Defendants Williams and Sowders were contacted by Edward Flint and told that Flint feared he would be killed. Williams stated that he was aware of the situation and that an investigation was being conducted.

In their Reply Brief, the Defendants relied upon *Sanderfer v. Nichols*, 62 F.3d 151 (6th Cir. 1995), to argue that the conduct of Defendants Lewis, Williams and Sowders, like the defendant in *Sanderfer* was, at most, negligent. In *Sanderfer*, an inmate with a heart condition died while incarcerated. *Id.* at 153. The court found that the medical worker was not liable under § 1983 for failing to discover the inmate's heart condition, and that her failure to check the decedent's medical records was, at most, negligent. *Id.* at 155. The *Sanderfer* court concluded that as the medical-worker defendant was not aware of the inmate's risk of heart failure, she could not have been deliberately indifferent to that risk. *Id.*

Here, in contrast, Defendants Lewis, Williams and Sowders all had actual knowledge that Flint's life was in danger. Unlike the defendant in *Sanderfer,* the Defendants here did not have to undertake any further investigation, or draw any inferences following Edward Flint's phone call to conclude

On October 4, 1995, Underwood arrived at the print shop just before the doors were to be unlocked for lunch. Underwood asked Defendant Whisman about getting his job back at the print shop. At that time, Whisman understood that Underwood was not permitted to enter the print shop. Defendant Whisman also knew that inmates were not allowed in the print shop if they were not employed there. Despite this knowledge, Defendant Whisman told Underwood that it would be "okay" for him to remain in the foyer of the print shop.

At 11:00 a.m., Whisman unlocked the front door of the print shop to allow the meritorious inmates to go to lunch. Defendant Eldridge recently had left the shop to escort a repairman through the service gate. When Whisman opened the door, Underwood was "looking towards the front of the institution, looking in the direction of where Mr. Eldridge would be returning." Eldridge left the door unlocked, giving Underwood access to the print shop. Fifteen minutes later, Defendant Whisman went to the back door of the bindery, leaving the shop free from supervision. Underwood entered the print shop, walked into the tool room, grabbed a hammer and bludgeoned Flint to death.[6]

Before the murder, Mack Beasley, a civilian supervisor at LLCC, told Eldridge that Underwood had threatened Flint's life. Gray, the Internal Affairs Officer, eventually learned through his postmortem investigation that Eldridge and Whisman both had been informed that Underwood had lodged a death threat against Flint. After the murder, Gray also interviewed Beasley, who confirmed that Harper told him of Underwood's death threat. Warden Barry told Gray not to write a report of the incident because it was after the fact.

---

[6] Although the statements arguably constitute hearsay, at trial, they may be offered by the Plaintiff not for the truth of the matter asserted, FED. R. EVID. 801, but to show notice.

## B. Procedural History

The Plaintiff originally filed his complaint on September 6, 1996, in the Western District of Kentucky. The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. An amended complaint was filed on June 30, 1998. Following the Plaintiff's motion, a second amended complaint was filed on October 22, 1998. The Plaintiff obtained new counsel on February 3, 1999. On May 7, 1999, the Defendants, with the exception of Defendant Underwood, filed a motion for summary judgment to which the Plaintiff responded. On January 5, 2000, the Court entered an opinion and order rejecting the Defendants' defense of qualified immunity. The Defendants filed their notice of appeal on February 3, 2000. This Court has jurisdiction over a denial of qualified immunity as a final decision pursuant to 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

The issues presented on appeal are: (1) whether the Plaintiff's pleadings failed to state a claim under § 1983; (2) whether the District Court improperly treated the Defendants as a single defendant in reaching the determination of whether each Defendant was entitled to qualified immunity; (3) whether the Plaintiff included additional facts in the appeal that were not before the District Court, and (4) whether the District Court properly denied the Defendants' defense of qualified immunity.

## II. STANDARD OF REVIEW

On appeal, this Court reviews the grant or denial of summary judgement *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). All facts, as well as all inferences drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

been established, and that Defendant Gray violated the Cruel and Unusual Punishment Clause of the Eighth Amendment.

### c. Whisman

Defendant Whisman, prior to the date of the murder, knew that Borsch and Underwood, after recently losing their jobs, had been banned from the print shop. On the date of the murder, Whisman knew that Underwood was standing outside the print shop in which Flint was working, and that the shop contained a wealth of dangerous tools. With Underwood standing outside in the foyer, and Defendant Eldridge temporarily absent, Defendant Whisman walked to the back of the shop, leaving an unlocked door and the shop unattended.

The Court concludes that these factors demonstrate that Whisman acted with deliberate indifference. He was aware of the risk presented to inmate health and safety presented by a recently terminated print shop employee standing outside of an unlocked door that led to a goldmine of dangerous tools. Under the first prong of the test for qualified immunity set forth in *Williams*, the Court finds that Defendant Whisman violated Flint's Eighth Amendment rights.

### d. Eldridge

Before the date of the murder, Eldridge was made aware of Underwood's threat leveled at Flint.[12] The Court finds that Defendant Eldridge disregarded Underwood's articulated threat to Flint's health and safety. This scenario alone supports this Court's finding of deliberate indifference on behalf of Defendant Eldridge. In addition, on the day of the murder, Eldridge left the print shop where Flint was working, shortly before the doors would be unlocked for lunch, leaving Whisman alone to supervise. The Court finds that there are sufficient facts to conclude that Defendant Eldridge acted

---

[12]Defendant Eldridge also understood that Borsch and Underwood had recently lost their jobs and had been banned from the print shop.

is whether each defendant knew of, and disregarded, this excessive risk.  The evidence as to what each individual Defendant knew, with respect to the risk to Flint's health and safety, will be examined seriatim.

### a.  Montgomery

The risk to Flint's safety began when Flint first reported to prison officials that Rust was calling Montgomery at home. As a result, Defendant Montgomery threatened Flint by stating that he would "fix it so that Flint would never go home."   By leveling this slightly veiled death threat, Montgomery became the first mover in the chain of events that eventually lead to Flint's murder.   Not only did Montgomery know of the risk to Flint's life, he essentially created it.  Montgomery did not have to draw an inference based on the facts presented to him to conclude that an excessive risk to Flint's safety existed. *Farmer*, 511 U.S. at 837. Montgomery, therefore, acted deliberately indifferent to a known risk to Flint's life, which he, himself created.  The Court finds that Defendant Montgomery's conduct satisfies the first element of the *Williams* test of qualified immunity.

### b.  Gray

Defendant Gray had the following facts before him prior to Flint's murder: a copy of Webb and Beckstrom's investigative report detailing Flint's role in reporting the unlawful activities taking place at the print shop; knowledge that Montgomery told Flint that he was "going to get his"; a copy of Underwood's letters written to Rust wherein he threatened Flint's life, and an order, issued by his office, banning Underwood and Borsh from the print shop.

Defendant Gray knew that at least two individuals, Rust and Montgomery, had threatened Flint's safety, if not his life. Gray was deliberately indifferent to Flint's health and safety once he learned of the threats leveled against him.  Gray did not have to draw an inference to conclude that Flint was in danger--the risk was direct and concrete. This Court therefore finds that the first prong of the test for qualified immunity has

Qualified immunity is a question of law also to be reviewed *de novo* by this Court. *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir. 1991).   The denial of a motion for summary judgment on the issue of qualified immunity is immediately appealable if the affirmative defense of qualified immunity rests on an issue of law. *Mitchell*, 472 U.S. at 530; *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) (finding that "[a] defendant who is denied qualified immunity may file an interlocutory appeal with this Court only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law.") (citations omitted).   A court should not grant summary judgment on the issue of qualified immunity if there exists a genuine issue of material fact, "involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights." *Poe v. Haydon*, 853 F.2d 418, 425-26 (6th Cir. 1988) (citations omitted). Mixed questions of fact and law are treated as questions of law for purposes of an interlocutory appeal. *Williams*, 186 F.3d at 690.

The affirmative defense of qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  An official may, however, be held individually liable for civil damages for the unlawful action if the action was not objectively reasonable in light of the legal rules that were "clearly established" at the time it was taken. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.   When determining whether a right is "clearly established," this Court must look "first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other

circuits." *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991).

The defendant bears the initial burden of coming forward with facts to suggest that he or she acted within the scope of his or her discretionary authority during the incident in question. The burden then shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

The Defendants in this case have accepted the Plaintiff's facts as true for the present appeal, presenting this Court with a mixed question of law and fact as to whether the Defendants are entitled to qualified immunity as a defense to the Plaintiff's cruel and unusual punishment claim. This Court has jurisdiction over appeals either granting or denying qualified immunity that rest on a mixed question of law and fact. *Williams*, 186 F.3d at 690. Before reviewing the question of whether qualified immunity was properly denied, this Court must first address the Defendants' argument that the Plaintiff has failed to state a claim under § 1983.

### III. ANALYSIS

### A. Failure to State a Claim

In the Defendants' original motion filed with the District Court, although labeled as one for summary judgment, they argued that the Plaintiff failed to state a claim upon which relief can be granted. On appeal, the Defendants again have raised the argument that the Plaintiff has failed to state a claim under § 1983.

In its opinion, the lower court addressed the Defendants' failure to state a claim argument in a footnote:

Where the harm is perpetrated by another prisoner, rather than by a government official, the claim is characterized as one of "conditions of confinement," rather than of "excessive use of government force." *Thaddeus-X v. Blatter*, 175 F.3d 378, 400-01 (6th Cir. 1999) (citations omitted).

To succeed on a conditions of confinement claim, a plaintiff must show: (1) the deprivation alleged is, objectively, 'sufficiently serious,' and (2) the prison official had a sufficiently culpable state of mind. *Farmer*, 511 U.S. at 834. A sufficiently culpable state of mind is one of 'deliberate indifference' to inmate health and safety. *Id.* (quoting *Wilson*, 501 U.S. at 302-03.) In defining deliberate indifference, the *Farmer* Court held:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837; *see also Thaddeus-X*, 175 F.3d at 402. The test for deliberate indifference contains both a subjective and an objective component. *Farmer*, 511 U.S. at 837-38.

Undertaking the analysis set forth in *Farmer,* as to the objective element, it is plain that the harm caused to Flint was sufficiently serious. He was murdered. As to the state of mind element — whether there was a deliberate indifference to inmate health and safety — the court finds this requirement met. The excessive risk posed to Flint's health and safety was that his life was in danger once he reported the illegal activities taking place in the print shop. As soon as Flint reported to prison authorities that Rust was calling Montgomery at home, Flint became a "marked man."

The only remaining question under the deliberate indifference prong of the conditions of confinement analysis

This Court agrees with the District Court and concludes that all of the Defendants in the present appeal, including Defendant Montgomery, were state actors. The fact that Correctional Industries may have been in a contractual[10] relationship with the State of Kentucky is of no consequence. Just as the physician in *West*, Defendant Montgomery, through Correctional Industries, performed functions typically attributed to the State: housing and providing security for individuals who had been convicted of a crime and sentenced to a term of imprisonment. The Commonwealth of Kentucky delegated its responsibilities to Defendant Montgomery, just as the State delegated its responsibilities for medical care to the physician in *West*. Defendant Montgomery is, therefore, a state actor for purpose of § 1983.

### 1. Commission of a Constitutional Violation

Having determined that the Defendants are state actors for the purpose of § 1983, the next inquiry is whether Defendants are entitled to qualified immunity. Turning to the first prong of the test for qualified immunity, the Court must determine whether a constitutional violation occurred, that is, whether the Defendants may be held liable for subjecting Flint to cruel and unusual punishment, as proscribed by the Eighth Amendment. *Williams*, 186 F.3d at 691.

In conditions of confinement litigation, the Eighth Amendment is triggered by the "unnecessary and wanton infliction of pain . . . ." *Farmer v. Brennan*, 511 U.S. 825, 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).[11]

---

[10] The exact relationship between the state of Kentucky and Correctional Industries is not clear as this issue was not briefed by the parties.

[11] As Flint was murdered at the hands of another inmate through the use of a hammer, it is beyond question that the deprivation itself is actionable. *See Farmer*, 511 U.S. at 834 (finding that "the deprivation alleged must be, objectively 'sufficiently serious,' . . . [and] a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities . . . .'") (citations omitted).

When the plaintiff filed his complaint and first amended complaint he was proceeding *pro se* in this case. While he pleaded negligence as the basis for his Eighth Amendment / § 1983 claim and mere negligence is insufficient to support such a claim, the facts of the case meet the deliberate-indifference standard required for such claims. The plaintiff is now represented by counsel and the court will not read his early complaints as narrowly as the defendants insist. The defendants have had ample notice of the general nature of the plaintiff's claims and the facts underlying them, regardless of the legal terminology used in the initial pleadings.[7]

The statement of facts presented in the District Court's opinion included materials that were not part of the second amended complaint, nor part of the Defendants' answer, which leads this Court to conclude that the District Court treated the Defendants' motion as one for summary judgment and not as a motion to dismiss under Rule 12(b)(6). In addition to the four exhibits attached to the Plaintiff's response, the Court had, by the time it issued its opinion and order, over forty deposition transcripts at its disposal.[8]

Just as the District Court did, this Court will treat the Defendants' motion as one for summary judgment and not as one to dismiss. FED. R. CIV. P. 12(b) (providing that if on a

---

[7] The Defendants argue that the District Court erred, in that the Plaintiff was not proceeding *pro se* at the time the complaints were filed. The Defendants are correct. The second amended complaint was filed on October 22, 1998, but Edward Flint did not make a motion to withdraw his attorneys until November 12, 1998. Edward Flint obtained new counsel on February 3, 1999, three months before the Defendants' motion for summary judgment was filed.

[8] The Defendants contend that eighteen depositions had been taken by April 30, 1999, the date the District Court set as the discovery cut-off date on the issue of qualified immunity. The docket for the case, however, reflects several discovery deadlines, the last of which was a June 18, 1999 Order by the trial judge setting the discovery deadline for September 15, 1999.

motion to dismiss under Rule 12(b)(6), "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . . "). Under Rule 56(c), the Court need not focus merely upon the pleadings to determine whether the Plaintiff has stated a claim upon which relief may be granted; the Court may rely upon ". . . depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . ." FED. R. CIV. P. 56(c).

In their Reply Brief, the Defendants argue: "the plaintiff, even at the summary judgment stage, first alleges sufficient facts in his pleadings to establish a § 1983 claim **and** then must **support** those allegations with enough evidence to meet the required heightened burden of production." The Defendants have misread Rule 56(c). The Defendants essentially have argued that Rule 56 tests the validity of the Plaintiff's claims retrospectively to determine whether the plaintiff stated a claim at each stage of the litigation, including at the pleading stage. But, as the pleadings were uncontested until the Defendants filed their motion for summary judgment, and as additional evidence was introduced at that time, this Court will, under Rules 56(c) and 12(b), look outside the pleadings to determine whether the Plaintiff has stated a claim upon which relief can be granted. *See, e.g.*, 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2721 (3d ed. 1998) (stating that "[t]he formal issues framed by the pleadings are not controlling on a motion for summary judgment; the court must consider the issues presented by the other material offered by the parties on the motion to determine whether the Rule 56 request should be granted.").

Since this Court is not bound by the pleadings in determining whether the Plaintiff has stated a claim for cruel and unusual punishment, the question before the Court is whether the Plaintiff has stated a claim under Federal Rule of Civil Procedure 56(c). This question is the same one this Court will consider when it examines the first prong of the test for qualified immunity, that is, whether a "constitutional

Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere. *Tuttle v. Oklahoma City*, 471 U.S. 808 (1985).

Section 1983 has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998); *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 33 (6th Cir. 1992). As for the state action requirement, six of the Defendants, Lewis, Sowders, Williams, Whisman, Eldridge, and Gray, are clearly state actors since they worked for the Kentucky Department of Corrections. Defendant Montgomery, in contrast, was employed by Correctional Industries, a private entity. The District Court found that Defendant Montgomery was a state actor because he oversaw "the rehabilitation of inmates in prison, [and that] Correctional Industries was performing a traditional state function and was clothed with the authority of the state, and its actions thus were fairly attributable to the state."

The central question to be answered in determining whether a private party is a "state actor" is whether their actions are "fairly attributable to the state." *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). In *West v. Adkins*, 487 U.S. 42 (1988), the issue before the Court was whether a private physician who was under contract to provide medical services to inmates was a state actor for purposes of § 1983. *Id*. at 48-49. In concluding that the physician was a state actor, the Court stated:

> It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State . . . . The State bore an affirmative obligation to provide adequate medical care to West; the State delegated that function to respondent Atkins; and respondent voluntarily assumed that obligation by contract.

*Id*. at 55-56.

considered by this Court as the deposition was taken after the District Court's January 5, 2000 opinion.

Finally, the January 18, 2000 deposition of Defendant Sowders and the February 4, 2000 deposition of Tom Grissom will not be considered by this Court in reaching the defense of qualified immunity since the depositions were taken after the District Court issued its Opinion and Order.

## D.  Qualified Immunity

This Circuit recently identified a three-prong test for evaluating a claim of qualified immunity:

First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Williams*, 186 F.3d at 691 (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996)).

The individually-named Defendants claim that they are entitled to summary judgment based on the affirmative defense of qualified immunity against Edward Flint's Eighth Amendment claim brought under § 1983.  Section 1983 provides:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

violation occurred."  *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999).  The question of whether the Plaintiff has stated a claim, therefore, will be answered at the same time this Court determines whether the District Court properly denied summary judgment on the defense of qualified immunity.

## B.  District Court's Consideration of the Evidence

The Defendants argue that the District Court improperly construed their claim of qualified immunity in that the court did not consider separately the facts relevant to each Defendant's defense.  The Defendants are incorrect in this assertion since the District Court did, in fact, consider the facts that pertained to each Defendant.  The Court found:

The facts of this case make it obvious that Flint's safety was in serious jeopardy at LLCC.  The falsified incident report and the death threats in Rust's letter essentially emblazoned on Flint's back a big, red target mark which was ignored by prison officials.  Defendants Lewis, Sowders, and Williams had direct knowledge of the death threats levied against Flint and of his fear for his personal safety, having been informed of them by Edward Flint and Tom Burch, but took no steps to protect Flint.  Defendant Gray knew of Rust's threats against Flint made to Underwood and of Underwood's [sic] imminent reclassification, but he also took no steps to protect Flint.  Defendants Eldridge and Whisman also knew that Underwood posed a threat to Flint and yet allowed him unsupervised access to the print shop while Flint was there, which led directly to Flint's murder.

Hence, Flint has fulfilled the second requirement of an Eighth Amendment claim, showing that defendants Lewis, Sowders, Gray, Williams, Eldridge, and Whisman acted with deliberate indifference to his safety.

The only Defendant that the District Court did not address was Defendant Montgomery.  In commenting on Defendant Montgomery, the Court, however, did find:

The prison's management of its print shop also exposed Flint to a substantial risk of serious danger, particularly after the antagonisms smoldering between Montgomery and his allies . . . culminating first with Montgomery's falsifying an incident report in order to retaliate against Flint and then with the transfer of Montgomery and firing of Underwood, Borsch, and Rust.

The Defendants' argument, however, even if true, is without import.  Because this Court is to examine the issue of qualified immunity *de novo*, we will review anew each Defendant's involvement in Flint's murder to determine whether each Defendant is entitled to qualified immunity.

### C.  Facts Before the District Court

The Defendants contend that the following evidence, presented by the Plaintiff in his Brief, was not before the District Court: the July 16, 1999 deposition of Mack Beasley; the July 16, 1999 deposition of Tommy Eldridge; the January 20, 2000 deposition of Tony Williams; the January 18, 2000 deposition of Dewey Sowders; and the February 4, 2000 deposition testimony of Tom Grisson.  The Defendants correctly argue that this Court cannot consider deposition testimony that was not before the District Court.  *See, e.g., Good v. Ohio Edison Co.*, 149 F.3d 413, 421 n.16 (6th Cir. 1998); *Niecko v. Emro Mktg. Co.*, 973 F.2d 1296, 1303 (6th Cir. 1992).

The Defendants first contend that Beasley's deposition testimony filed with the District Court on August 13, 1999, is not properly before this Court.  The deposition details Harper telling Beasley that Underwood threatened Flint's life.[9]  As the deposition was filed with the District Court before it issued its January 2000 opinion and was relied upon by the

[9]This evidence first was relied upon by the Defendants in their Brief filed with this Court, and then by the Plaintiff in his Brief, by citing to the Defendants' Brief.

District Court in its opinion and by both parties in their briefs filed with this Court, this Court will consider the testimony.

The disputed content of Beasley's deposition also was presented in the deposition of Defendant Gray taken on June 11, 1999, and was detailed in Gray's investigative notes.  The Defendants were aware that multiple references to Underwood's death threat surfaced during discovery.  In their Brief, the Defendants themselves argued that the District Court had before it Gray's investigation notes memorializing Underwood's threat.  The District Court relied upon this same threat in its opinion, where it found: "Defendants Eldridge and Whisman also knew that Underwood posed a threat to Flint and yet allowed him unsupervised access to the print shop while Flint was there, which led directly to Flint's murder."  This Court, accordingly, will consider this evidence.

The Defendants next contest the testimony taken from Eldridge's deposition of July 16, 1999 and filed with the District Court on August 13, 1999.  Eldridge's testimony details the fact that he knew the basis for the Montgomery investigation, and that he knew that Montgomery was removed from the print shop as a result of allegations of misconduct, including granting favors to inmate friends.  The other evidence questioned by the Defendants is Eldridge's testimony that he knew that tools in the print shop could be used as weapons.  This Court finds that since Eldridge's deposition testimony was filed on August 13, 1999, and was before the District Court prior to it rendering its January 2000 decision, this evidence is properly before this Court.

The January 20, 2000 deposition testimony of Tony Williams that the Defendants contend is not properly before this Court regards Edward Flint calling Defendant Williams to tell him that Flint's life was in danger.  Contrary to the Defendants' argument, the record reflects that the Plaintiff cited Edward Flint's deposition testimony of June 11, 1998, for that same proposition.  The remaining January 5, 2000 deposition testimony provided by Williams will not be