*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0108P (6th Cir.)
File Name: 04a0108p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

HASSAN HARAJLI,
  *Plaintiff-Appellant,*

  *v.*

HURON TOWNSHIP, a
Michigan Charter Township;
GILBERT POWELL, BRIAN
KOSTIELNEY, and JOHN
MAIER, Jointly and Severally,
  *Defendants-Appellees.*

No. 02-2169

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 01-60158—Marianne O. Battani, District Judge.

Argued: March 17, 2004

Decided and Filed: April 16, 2004

Before: KRUPANSKY and GILMAN, Circuit Judges;
RUSSELL, District Judge.[*]

_____

[*] The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

———————

## COUNSEL

**ARGUED:** Kevin L. Laidler, LAW OFFICES OF KEVIN LAIDLER, Pontiac, Michigan, for Appellant. Marcia L. Howe, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, Farmington Hills, Michigan, for Appellees. **ON BRIEF:** Kevin L. Laidler, LAW OFFICES OF KEVIN LAIDLER, Pontiac, Michigan, for Appellant. Marcia L. Howe, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, Farmington Hills, Michigan, for Appellees.

———————

## OPINION

———————

RONALD LEE GILMAN, Circuit Judge. Hassan Harajli is an Arab-American who lives in Huron Township, Michigan. On March 26, 2001, Harajli allegedly beat his ex-wife, Nada Harajli (Nada), pointed a gun at her head, and threatened to kill her unless she gave him sole custody of their minor children. Two weeks later, officers from the Huron Township Police Department accompanied Nada to Harajli's house and stood by while she removed her belongings. Harajli called the police later that day, claiming that Nada had broken into his house and stolen his property. Two days later, a police lieutenant allegedly informed Harajli that the police department would not pursue an investigation of Nada's conduct because "this is a domestic issue and, another thing, in this country we don't pull gun on woman [sic]."

Harajli subsequently filed this lawsuit, contending that (1) the officers' presence at his house constituted a search in violation of the Fourth Amendment, (2) the officers' presence made him more vulnerable to the loss of his property, in violation of his substantive due process rights, and (3) the

lieutenant's refusal to pursue the investigation of Nada was based on Harajli's gender and national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment. The district court granted summary judgment in favor of the defendants on all claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

Harajli and Nada were divorced in 1996. Nada moved back into Harajli's house, along with their three children, in February of 2001. She was given a garage-door opener in order to have access to the house.

On March 26, 2001, Harajli asked Nada to sign papers giving him sole custody of the children. When she refused, Harajli allegedly beat Nada with his hands and with a handgun, pointed the gun at her head, and threatened to kill her. Nada reported the incident to the Huron Township Police Department. In her statement, Nada listed the address of Harajli's house as her place of residence. Later that day, Huron Township police officers arrested Harajli on charges of assault and possession of a firearm during the commission of a felony. (Harajli was subsequently acquitted on both charges after a bench trial.)

On April 9, 2001, Nada's attorney called the Huron Township Police Department to request that officers accompany Nada to Harajli's house so that she could safely remove her belongings. This procedure is known as a "civil standby." Nada drove to the police station later that day and spoke with Officer Gilbert Powell, a defendant in this case. She then drove from the station to Harajli's house in her own car. Powell and Officer Brian Kostielney, another defendant in this case, drove separately to Harajli's house. When Nada and the officers arrived at the house, representatives of a moving company were at the scene, waiting to move Nada's belongings. A legal assistant employed by Nada's attorney also arrived at the house sometime thereafter.

Nada gained access to the house by using her garage-door opener. She then went inside to pack her clothes into bags. The movers, meanwhile, entered the garage to remove Nada's furniture that was stored there and went inside the house to retrieve the bags of clothes.

Whether the officers themselves entered the house is disputed. Officer Kostielney acknowledged at his deposition that he and Officer Powell "went in through the garage," but denied that the officers entered the interior of the house. But when Nada was asked at her deposition whether the officers came inside, she replied, "I don't know. Maybe, yeah. Yeah, I saw one." And the legal assistant to Nada's attorney, who was also present at the house that day, stated at his deposition:

> The police told me that they were in the house. No, I didn't see them actually in the house. They were in the garage area, but they didn't go through the door that led from the garage area to the interior of the house while I was there, but they told me that they were in the house, because my concern was that somebody was in the house. It seemed like a house with a lot of floor space. Maybe somebody was in the house, and they said they had checked the house, that nobody appears to be home.

The officers apparently did not participate in the removal of any property from either the house or the garage. At his deposition, Officer Kostielney agreed with the statement that the officers "simply stood by while the property was being removed from the premises . . . ." Harajli cites no evidence in the record that contradicts Kostielney's assertion.

Soon after the legal assistant arrived at the house, the officers left. The movers then finished loading Nada's belongings onto the truck without incident. Later that day, Harajli contacted the police department to report that property had been stolen from his house. The police investigated the incident by interviewing a neighbor who had seen the moving truck outside, talking to representatives of the moving

company, and speaking with Nada. Two days later, on April 11, 2001, Harajli went to the police station and asked Police Lieutenant John Maier, another defendant in this case, about the status of the investigation. Harajli, at his deposition, gave the following account of his conversation with Maier:

> [Maier] comes out to the lobby and he says—I said okay, what are you guys doing about the investigation. He said well, nothing. I said what do you mean nothing. He said well, this is a domestic issue and, another thing, in this country we don't pull gun on woman [sic], he points his finger in my face like that.

Maier, according to Harajli, also refused to accept a stolen property form that Harajli had filled out.

Later that day, Maier received a call from Fred Berry, a Dearborn police officer and member of the Arab-American League. Berry asked Maier why the Huron Township police were not pursuing the investigation of Nada. Maier responded that "it was a civil matter." Nine days later, Maier met with Harajli's attorney and once again stated that the police department would not pursue the investigation.

Maier subsequently changed his mind and, on April 25, 2001, filed a form recommending that the prosecutor's office request a warrant for Nada's arrest. The prosecutor's office rejected the warrant recommendation the following day.

In July of 2001, Harajli filed this lawsuit in the district court, naming as defendants Huron Township, Lt. Maier, and Officers Kostielney and Powell. The complaint alleged that the defendants were liable under 42 U.S.C. § 1983 because the conduct of the police violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution. In August of 2002, the district court granted summary judgment in favor of the defendants. This timely appeal followed.

## II. ANALYSIS

Harajli brought this lawsuit pursuant to 42 U.S.C. § 1983, which provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

"Section 1983 has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights." *Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001).

### A. Standard of review

We review the district court's grant of summary judgment de novo. *Sperle v. Michigan Dep't of Corr.*, 297 F.3d 483, 490 (6th Cir. 2002). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B. Harajli's Fourth Amendment claim

Harajli contends that Officers Kostielney and Powell violated the Fourth Amendment by conducting an

unreasonable search of his house.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  In analyzing any Fourth Amendment issue, the threshold question is whether there has been either a "search" or a "seizure."

The Supreme Court has explained that "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). There is no doubt that Harajli had a reasonable expectation of privacy in his home. *See Silverman v. United States*, 365 U.S. 505, 511 (1961) ("The Fourth Amendment, and the personal rights which it secures, have a long history. At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."). An intrusion into Harajli's home by the police would therefore constitute a Fourth Amendment search.

Officer Kostielney acknowledged at his deposition that he and Officer Powell entered the garage of Harajli's house, but denied entering the interior.  But Nada and her attorney's legal assistant both recalled facts indicating that the officers did enter the house.  Because the issue in this case is whether summary judgment was proper, we must view the evidence and draw all reasonable inferences in favor of Harajli as the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  We must therefore assume for the purposes of this appeal that the officers entered both the garage and the interior of Harajli's house, thereby conducting a Fourth Amendment search of the entire premises.

A search by police, however, does not violate the Fourth Amendment if "voluntary consent has been obtained, either from the individual whose property is searched . . . or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Even if the third party does not in fact possess "common

authority over the premises," the search is still valid under the Fourth Amendment if the police officers *reasonably believed* that the third party had such authority. *Id.* at 186.  In evaluating the officers' actions under this objective standard, we must ask: "[W]ould the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting party had authority over the premises?" *Id.* at 188.

An analogous case is *Rhodes v. McDannel*, 945 F.2d 117 (6th Cir. 1991)  (per curiam), where the police received consent to enter a home from a third party who had previously called the police from that location, occasionally lived there, and "referred to the residence as her home address." *Id.* at 119.  This court held that the police reasonably believed that the third party had the authority to consent to their entry. *Id.* In the present case, the evidence of apparent authority is even stronger than in *Rhodes*. When Nada provided the police with a written statement after she was allegedly beaten by Harajli, she listed the address of Harajli's house as her place of residence.  The police therefore knew that Nada had resided at the house in the recent past.  And evidence that Nada still had "common authority over the premises" was provided by the fact that she possessed a garage-door opener, which she used to gain access to the house.  The officers therefore could have reasonably believed that Nada had the authority to consent to their entry inside.

One remaining question is whether Nada actually gave consent to the officers' entry.  In her deposition, she recalled seeing an officer in the house, but never stated that she expressly gave the officers permission to enter.  On the other hand, Nada had requested that the officers accompany her to the house because she was "scared to go by myself over there."  And Nada apparently never objected to the entry of at least one officer into the interior of the house.  As one state supreme court has observed, "a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" *State v. Flippo*,

575 S.E.2d 170, 178 (W. Va. 2002). In the present case, even if Nada did not recite that talismanic phrase, the circumstances clearly indicate that she wanted the officers to accompany her inside the house in order to ensure her safety. The officers' purported entry into Harajli's house therefore did not violate the Fourth Amendment because it was based upon Nada's consent.

## C. Harajli's substantive due process claim

Harajli next contends that the civil standby conducted by Officers Kostielney and Powell made him more vulnerable to the loss of his property, violating his rights under the substantive component of the Fourteenth Amendment's Due Process Clause. Specifically, Harajli argues that "Civil Standby procedures . . . placed plaintiff in a much more precarious position than had the authorities not become involved."

Harajli relies upon *DeShaney v. Winnebago County*, 489 U.S. 189 (1989), in which the Supreme Court held that no substantive due process violation occurred where state officials knew that a minor was being abused by his father but "did not act to remove [the minor] from his father's custody." *Id.* at 191. Subsequently the father beat his son severely, causing permanent brain damage. *Id.* at 193. The Court held that "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. But the Court also recognized an exception to this general rule:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*Id.* at 200.

Assuming for the sake of argument that *DeShaney* applies to cases that involve a deprivation of property, rather than the liberty interest at stake in *DeShaney*, Harajli might be able to establish a substantive due process violation if he could demonstrate that the Huron Township police officers placed Harajli in a position where he was unable to prevent the removal of the property from his house. But Harajli apparently had advance notice, from Nada's attorney, that she intended to remove her property from the house. At that point Harajli could have attempted to recover the garage-door opener from Nada, asked his lawyer to seek an injunction preventing her from entering the house, or called the police and asked them to intervene. As the defendants point out, Harajli "had ample legal and financial resources to protect himself from any alleged perceived harm from his ex-wife, but chose not to do so . . . ." Harajli was certainly more capable of defending his rights than was the injured son in *DeShaney*. Because no substantive due process violation occurred in *DeShaney*, clearly none occurred in the present case. We therefore agree with the district court's decision on this issue.

## D. Harajli's equal protection claim

Harajli finally contends that Lt. Maier refused to accept the stolen property form, or to pursue the investigation of Nada, because of Harajli's national origin or gender, thereby violating his Fourteenth Amendment right to the equal protection of the laws. He argues that the statement "in this country we don't pull gun on woman" demonstrates that Maier's decision not to pursue the investigation of Nada was based upon Harajli's status as a male Arab-American.

Neither party cites a case where an equal protection claim was based upon the *failure* to prosecute someone for a crime, and we have been unable to find any. But this court has decided several cases that involved a claim of selective

prosecution, where the issue was whether the decision *to* prosecute a particular person was based upon discriminatory criteria. These cases apply with equal force to the present case. The facts are slightly different but the ultimate issue is the same—did law enforcement officials prosecute members of one group but not another because of a constitutionally protected characteristic?

In *Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000), this court explained that "[s]elective enforcement claims are judged according to ordinary Equal Protection standards, which require a petitioner to show both a discriminatory purpose and a discriminatory effect." *Id.* at 318. *Gardenshire* also articulated the following elements of a selective prosecution claim:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.
>
> *With regard to the first element, it is an absolute requirement that the plaintiff make at least a prima facie showing that similarly situated persons outside her category were not prosecuted.* Furthermore, there is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary; the standard is a demanding one.

*Id.* at 319 (emphasis added) (quotation marks and citations omitted).

The district court in the present case granted summary judgment in favor of the defendants on Harajli's equal protection claim because "[t]here's no evidence at all that he was treated differently" from either similarly situated women or non-Arab-Americans. And according to *Gardenhire*, "it is an absolute requirement that the plaintiff make at least a prima facie showing that similarly situated persons outside [his or] her category were" treated differently. Harajli, however, has produced no evidence showing that either Maier or the Huron Township Police Department as a whole have pursued investigations in similar circumstances where the complaining party was a woman or non-Arab-American. His equal protection claim therefore fails.

**E. Qualified immunity and municipal liability**

Harajli also challenges the district court's determination that the defendant officers are entitled to qualified immunity and that Huron Township is not liable for the actions of the officers. Because we have concluded that the actions of the defendant police officers did not violate Harajli's constitutional rights, we have no need to consider these affirmative defenses.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.