**Jennifer Marie MARRS, Plaintiff,**

v.

**Trooper Christopher TUCKEY and Trooper Patrick Daugherty, Defendants.**

**No. 03–74611.**

United States District Court, E.D. Michigan, Southern Division.

March 31, 2005.

Christina K. Fallowfield, Croswell, MI, for plaintiff.

James E. Long, Lansing, MI, for defendant.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

In the early morning hours of January 1, 2002, a pickup truck being driven by Aaron Gruner, the boyfriend of Plaintiff Jennifer Marie Marrs, was stopped by Defendant Michigan State Police Troopers Christopher Tuckey and Patrick Daugherty for failure to come to a complete stop at a stop sign. As Trooper Tuckey approached the vehicle and began to speak with Gruner, he observed that the truck's other front seat passenger, Plaintiff, was not wearing her safety belt. The trooper asked Plaintiff for identification so that he could issue a civil citation for the safety belt infraction, but Plaintiff refused to produce any identification or otherwise identify herself. After repeated requests and a threat of arrest failed to persuade Plaintiff to provide this information, Trooper Tuckey placed Plaintiff under arrest, handcuffed her, and put her in the back seat of

the State Police patrol car. Plaintiff ultimately was charged with resisting and obstructing a police officer in violation of Mich. Comp. Laws § 750.479, a charge that was dismissed by a state district court judge in May of 2002.

As a result of this incident, Plaintiff commenced the present suit in this Court on November 17, 2003, asserting a variety of federal constitutional claims under 42 U.S.C. § 1983.[1] In essence, Plaintiff contends that she was unlawfully arrested for exercising a purported constitutional right not to identify herself to the Michigan State Police troopers who had detained her and her boyfriend for suspected traffic infractions. Plaintiff further alleges that the Defendant troopers unlawfully seized and searched her purse without consent in order to obtain her identification.

■ As the emerging case law now makes clear, the U.S. Constitution grants no such privilege to refuse a police officer's request for identification during the course of a lawful investigative detention. See Hiibel v. Sixth Judicial District Court, 542 U.S. 177, 124 S.Ct. 2451, 2459–61, 159 L.Ed.2d 292 (2004). Moreover, no such "clearly established" right existed at the time of Plaintiff's arrest, a point illustrated by the Sixth Circuit's ruling in a case decided just three days after the challenged arrest. See Risbridger v. Connelly, 275 F.3d 565, 569–72 (6th Cir.2002). In light of these rulings, it might appear that Plaintiff's claims in this case cannot possibly succeed, at least to the extent that they challenge Plaintiff's arrest for refusing to identify herself.

Nonetheless, while the parties largely failed to address the point in their briefs in support of and opposition to Defendants' August 31, 2004 motion for summary judg-

---

1. Plaintiff's initial complaint named a third defendant, Commander Michael Morenko, who apparently was the supervisor of Troopers Tuckey and Daugherty. Plaintiff's first amended complaint, however, no longer includes Commander Morenko as a party, leaving only the two troopers as defendants.

ment, the Court has discerned at least some support in the record for a more fundamental constitutional challenge— namely, a claim that Plaintiff was arrested without probable cause in violation of the express terms of the Fourth Amendment. While *Hiibel* holds that a State *may* criminalize a refusal to produce identification during the course of a lawful investigative detention, it is another question altogether whether the Michigan Legislature has chosen to do so. At a minimum, Defendants' initial briefing in support of their summary judgment motion did not persuade the Court that Michigan law as it existed on January 1, 2002 authorized Plaintiff's arrest for refusing to identify herself.

This, then, was the focus of the discussion at the March 10, 2005 hearing on Defendants' pending motion. During the course of this hearing, defense counsel largely conceded that Plaintiff could not lawfully have been arrested for violating Michigan's "resisting and obstructing" statute, Mich. Comp. Laws § 750.479, because this statute, as it read at the time of Plaintiff's arrest, had been construed by the Michigan Supreme Court as proscribing only actual or threatened *physical* interference with a police officer's performance of his duties. *See People v. Vasquez,* 465 Mich. 83, 631 N.W.2d 711 (2001). Nonetheless, Defendants suggested that Plaintiff's arrest could be justified by resort to a different Michigan statute that prohibits any individual from "disguis[ing] himself or herself with intent to … hinder or interrupt any officer … in the legal performance of his or her duty." Mich. Comp. Laws § 750.217. Because Defendants raised this argument for the first time at the March 10 hearing, the parties were invited to submit supplemental briefs addressing this issue, and both sides have done so.

Having reviewed the parties' written submissions and the record as a whole, and having considered the arguments of counsel at the March 10 hearing, the Court now is prepared to rule on Defendants' motion. For the reasons set forth below, the Court finds that this motion must be denied.

## II. *FACTUAL BACKGROUND*

For present purposes, the parties largely agree upon the events surrounding the January 1, 2002 detention and arrest of Plaintiff Jennifer Marie Marrs. Immediately before her arrest, Plaintiff and her boyfriend, Aaron Gruner, had attended a New Year's Eve party at a friend's house in New Baltimore, Michigan. Gruner and Plaintiff then departed in Gruner's pickup truck, with Gruner driving and Plaintiff seated immediately next to him in the middle of the vehicle's front bench seat.

On January 1, 2002 at around 1:47 a.m., Defendant Michigan State Police Troopers Christopher Tuckey and Patrick Daugherty were on road patrol in their marked state police patrol car when they observed Gruner's pickup truck fail to come to a complete stop at a stop sign posted at the intersection of 25 Mile Road and County Line Road in Macomb County. Trooper Tuckey activated the patrol car's flashing lights and pulled the pickup truck over about a quarter of a mile east of this intersection.

After stopping Gruner's vehicle, Trooper Tuckey emerged from his patrol car and approached the driver's side of the pickup truck. Gruner rolled down his window and the trooper asked him to produce his driver's license and registration. At this point, Trooper Tuckey looked inside the pickup truck and noticed that Plaintiff, who was sitting next to Gruner in the front seat, was not wearing her safety belt. According to the trooper, Plaintiff first contended that she was wearing her safety belt, but then acknowledged that she was not. For her part, Plaintiff has testified

that she was wearing her seat belt while Gruner was driving his truck, but that she took it off in order to reach for and retrieve her purse after the state troopers had stopped the vehicle. Thus, when she initially responded affirmatively to Trooper Tuckey's inquiry whether she was wearing her seat belt, she understood the trooper to be asking whether she had been wearing the belt while the pickup truck was still in motion. She changed her response, however, when Trooper Tuckey expressly asked whether she was currently wearing her safety belt.

In light of this apparent violation of Michigan's seat belt law, which requires that each driver and front seat passenger "of a motor vehicle operated on a street or highway in this state shall wear a properly adjusted and fastened safety belt," Mich. Comp. Laws § 257.710e(3), Trooper Tuckey asked Plaintiff for identification so that he could issue her a civil citation.[2] Although Plaintiff was carrying a Michigan driver's license in her purse, she refused to produce this license or otherwise identify herself, based on her view that she "had done nothing wrong being a passenger" in her boyfriend's vehicle. (Plaintiff's Dep. at 40.) Despite repeated requests that she identify herself, and despite Trooper Tuckey's threat that "[i]f you don't tell me who you are right now, I'm going to place you under arrest," (id. at 45), Plaintiff steadfastly refused to provide this information.

Eventually, Trooper Tuckey ordered both Gruner and Plaintiff to exit their vehicle. When Plaintiff again refused to identify herself, the trooper arrested and handcuffed Plaintiff and placed her in the back seat of the state police patrol car.[3] Trooper Tuckey then asked Gruner to identify his passenger, and Gruner responded by providing Plaintiff's name. In addition, Gruner testified that Trooper Tuckey instructed him to produce Plaintiff's driver's license, and that he complied with this directive by retrieving the license from Plaintiff's purse and giving it to the trooper. In explaining this action, Gruner testified that he was "just scared" and that he thought it might "help" to retrieve Plaintiff's license. (Gruner Dep. at 32, 59.) Gruner further testified that Trooper Tuckey "was starting to get angry" and that he "felt threatened" by the trooper's decision to arrest Plaintiff and place her in the back of the patrol car, but he conceded that Trooper Tuckey never threatened any action against him if he elected not to retrieve Plaintiff's driver's license from his truck. (Id. at 33, 59.)

After obtaining Plaintiff's driver's license from Gruner, Trooper Tuckey returned to his patrol car and began to complete the paperwork associated with Plaintiff's arrest and Gruner's traffic infraction. During this process, the trooper detected the smell of alcohol coming from Plaintiff and observed that her eyes were red and bloodshot. Upon emerging from his patrol car to issue Gruner a citation for careless driving, Trooper Tuckey asked Gruner whether Plaintiff had been drinking that night, and Gruner responded that she had consumed alcohol earlier in the evening.[4] Based on this information, along with his own observations and his discov-

---

2. According to Plaintiff's deposition testimony, Trooper Tuckey never indicated that he wanted Plaintiff's identification in order to issue a citation for a safety belt violation.

3. An incident report prepared by the Defendant troopers indicates that Plaintiff was arrested for obstructing a police officer. (See Defendants' Motion, Ex. 2, Michigan State Police Incident Report at 1.) Plaintiff testified,

however, that she was not told the basis for her arrest, and that the troopers instead stated that she "wasn't going to find out until I left the jail, until I got my ticket." (Plaintiff's Dep. at 49–50.)

4. At her deposition, Plaintiff denied that she had consumed any alcohol that night—or, indeed, that she had ever consumed alcohol at

ery, upon inspecting Plaintiff's driver's license, that Plaintiff was only 18 years old at the time,[5] Trooper Tuckey asked Plaintiff to take a preliminary breath test ("PBT").[6]

Under Michigan law, a police officer "who has reasonable cause to believe a minor has consumed alcoholic liquor may require the person to submit to a preliminary chemical breath analysis," and "may arrest a person based in whole or in part upon the results" of this test. Mich. Comp. Laws § 436.1703(5).[7] Nonetheless, Plaintiff refused to take the test. Accordingly, the troopers drove Plaintiff to the Michigan State Police post in Richmond, where Trooper Tuckey prepared an application for a search warrant to draw Plaintiff's blood and test her blood-alcohol level. After obtaining the warrant, the troopers took Plaintiff to a nearby hospital, where a sample of Plaintiff's blood was drawn and sent to a Michigan State Police toxicology unit for analysis. The result of this test indicated that Plaintiff had a blood-alcohol content of .01 percent, suggesting that she had violated the Michigan prohibition against consumption of alcohol by minors.

Following this blood test, the troopers transported Plaintiff to the St. Clair County jail, where she remained until about 2:00 or 3:00 o'clock that afternoon. As a result of the night's incidents, Trooper Tuckey issued civil citations to Plaintiff for violating Michigan's safety belt law and for refusing to submit to a PBT. In addition, a St. Clair County prosecutor authorized criminal charges against Plaintiff for resisting and obstructing an officer in violation of Mich. Comp. Laws § 750.479, and for violating the prohibition against consumption of alcohol by minors, see Mich. Comp. Laws § 436.1703(1).

Plaintiff apparently paid a fine for the seat belt infraction, while the citation for refusing to submit to a PBT evidently was dismissed. At a state court hearing on July 10, 2002, Plaintiff pled *nolo contendere* to the offense of consumption of alcohol by a minor, and this charge was dismissed upon her successful completion of a 30-day term of probation. Finally, with regard to the charge of obstructing a police officer, state District Court Judge David C. Nicholson issued a May 7, 2002 opinion

---

any time. (*See* Plaintiff's Dep. at 25, 64.) Gruner testified, in contrast, that he had observed Plaintiff drink alcohol on perhaps five or six occasions, although not on the night of her arrest. (*See* Gruner Dep. at 11–12.) In reporting to Trooper Tuckey that Plaintiff had been drinking that night, Gruner merely "assumed" that she had because others had been drinking at the party, but he acknowledged that he did not, in fact, actually witness Plaintiff consume any alcohol that night. (*Id.* at 11.)

5. Under the Michigan statutes regulating the consumption of alcohol, a "minor" is defined as "a person less than 21 years of age," Mich. Comp. Laws § 436.1109(3), and such an individual generally is prohibited from purchasing, consuming, or possessing alcoholic beverages, Mich. Comp. Laws § 436.1703(1), with certain limited exceptions that are not applicable here.

6. Trooper Tuckey also suspected that Gruner had been drinking, and Gruner admitted as much under questioning. Accordingly, the trooper conducted a series of field sobriety tests on Gruner, including a PBT that revealed a blood-alcohol content of .07 percent. This was under the legal limit—.10 percent at the time, which has since been lowered to .08 percent, *see* Mich. Comp. Laws § 257.625(1)(b)—for drivers who are at least 21 years old, as Gruner apparently was at the time, and the record does not indicate that Gruner was cited for any alcohol-related infractions.

7. This same statute provides that a minor who refuses to submit to such a test "is responsible for a state civil infraction and may be ordered to pay a civil fine of not more than $100.00." Mich. Comp. Laws § 436.1703(5).

dismissing this charge. (*See* Defendants' Motion, Ex. 12.) In so ruling, Judge Nicholson cited the recent decision in *People v. Vasquez*, 465 Mich. 83, 631 N.W.2d 711 (2001), in which the Michigan Supreme Court construed Michigan's resisting and obstructing statute, Mich. Comp. Laws § 750.479, as prohibiting only conduct that rises to the level of threatened or actual physical interference with the duties of a police officer. In light of *Vasquez*, Judge Nicholson reasoned that Plaintiff's passive refusal to cooperate with Troopers Tuckey and Daugherty fell outside the reach of Michigan's resisting and obstructing statute.

Following the resolution of these state proceedings, Plaintiff commenced the present suit in this Court on November 17, 2003, advancing a variety of federal constitutional claims under 42 U.S.C. § 1983. In particular, Plaintiff alleged in her initial complaint that the Defendant troopers violated her constitutional right, purportedly founded in the First, Fourth, or Fifth Amendments, to refuse a police officer's demand that she identify herself.[8] More generally, Plaintiff asserts that the Defendant troopers violated her Fourth Amendment rights by arresting her without a lawful basis. Finally, Plaintiff alleges that an additional Fourth Amendment violation occurred when the Defendant troopers instructed Gruner to retrieve her driver's license from her purse. Through their present motion, filed on August 31, 2004, Defendants seek summary judgment in their favor on all of these § 1983 claims.

### III. *ANALYSIS*

#### A. The Standards Governing Defendants' Motion

In their pending motion, Defendants request an award of summary judgment in

their favor on all of the claims asserted in Plaintiff's first amended complaint. Under the relevant Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. As stated in *Celotex*:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

Upon reviewing this trilogy of decisions, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genu-

---

8. In her first amended complaint filed on August 30, 2004, Plaintiff apparently abandoned this broader claim of a federal constitutional right not to identify herself to police officers. Instead, her claims now appear to rest solely upon the Fourth Amendment.

ine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also Nernberg v. Pearce,* 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in resolving Defendants' motion.

**B. Plaintiff Possessed No Constitutional Right to Refuse to Identify Herself to the Defendant Troopers During a Lawful Investigative Detention.**

As noted above, Plaintiff's refusal on the night of her arrest to identify herself to Defendant Troopers Tuckey and Daugherty rested upon the contention, also advanced in her initial complaint in this case, that she enjoyed a federal constitutional privilege not to respond to such an inquiry. While it is not clear whether Plaintiff has abandoned this theory in her first amended complaint, Defendants have challenged this contention in their present motion, under the apparent belief that Plaintiff's Fourth Amendment claim of wrongful arrest cannot survive absent the existence of this claimed federal constitutional privilege. Accordingly, the Court first considers this question, and then addresses the larger significance of this issue to the proper resolution of Defendants' motion.

As observed at the outset, it is evident in the wake of the Supreme Court's recent decision in *Hiibel v. Sixth Judicial District Court,* 542 U.S. 177, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004), that the constitutional right claimed by Plaintiff at the time of her arrest does not exist. The petitioner in that case, Larry Hiibel, was charged with and convicted of the Nevada offense of "willfully resist[ing], delay[ing], or obstruct[ing] a public officer in discharging or attempting to discharge any legal duty of his office." *Hiibel,* 124 S.Ct. at 2455 (quoting Nev.Rev.Stat. § 199.280). The basis for this charge, in turn, was Hiibel's repeated refusal to identify himself during a police investigation of a report that a man had been seen assaulting a woman in a red and silver truck. When a deputy sheriff arrived at the scene and found Hiibel standing by the truck and a young woman sitting inside it, he asked Hiibel for identification eleven times and was refused each time, with Hiibel becoming increasingly agitated and insisting that he had done nothing wrong. Hiibel ultimately was warned that he would be arrested if he refused to comply, and then was placed under arrest when he still refused to produce any identification.

In charging Hiibel with obstructing an officer in the discharge of his duties, the Nevada prosecutor asserted that the arresting officer was entitled to demand Hiibel's identification under a Nevada statute

which authorizes the police to "detain any person whom the officer encounters under circumstances which reasonably indicate that the person has committed, is committing or is about to commit a crime," and which requires that "[a]ny person so detained shall identify himself." *Hiibel,* 124 S.Ct. at 2455–56 (quoting Nev.Rev.Stat. § 171.123).[9] Hiibel challenged the lawfulness of his prosecution, however, arguing that the application of this statute to his case violated his rights under the Fourth and Fifth Amendments. The Nevada courts upheld his conviction, and the Supreme Court affirmed.

Regarding his Fourth Amendment challenge, Hiibel maintained that any requirement that he identify himself would run counter to the reasoning in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, in which the Supreme Court has approved the limited detention of individuals who are reasonably suspected of involvement in criminal activity. Through various statements in this *Terry* line of decisions, the Supreme Court had suggested that *Terry* stops differ from full custodial detentions because suspects who are detained in *Terry* stops are not obliged to respond to police inquiries. Hiibel argued that these statements reflected an implicit recognition, at least, of the right to refuse to answer questions during a *Terry* stop. The Supreme Court disagreed:

> We do not read these statements as controlling. The passages recognize that the Fourth Amendment does not impose obligations on the citizen but instead provides rights against the government. As a result, the Fourth Amendment itself cannot require a suspect to answer questions. This case concerns a different issue, however.

Here, the source of the legal obligation arises from Nevada state law, not the Fourth Amendment. Further, the statutory obligation does not go beyond answering an officer's request to disclose a name. As a result, we cannot view the dicta in [*Terry* and other cases] as answering the question whether a State can compel a suspect to disclose his name during a *Terry* stop.

> The principles of *Terry* permit a State to require a suspect to disclose his name in the course of a *Terry* stop. The reasonableness of a seizure under the Fourth Amendment is determined by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests. The Nevada statute satisfies that standard. The request for identity has an immediate relation to the purpose, rationale, and practical demands of a *Terry* stop. The threat of criminal sanction helps ensure that the request for identity does not become a legal nullity. On the other hand, the Nevada statute does not alter the nature of the stop itself: it does not change its duration, or its location. A state law requiring a suspect to disclose his name in the course of a valid *Terry* stop is consistent with Fourth Amendment prohibitions against unreasonable searches and seizures.

*Hiibel,* 124 S.Ct. at 2459 (internal quotation marks and citations omitted).

Turning to Hiibel's Fifth Amendment challenge, the Court found that Hiibel had failed to demonstrate that the mere disclosure of his name posed a "reasonable danger of incrimination":

> In this case petitioner's refusal to disclose his name was not based on any

---

9. As noted by the Supreme Court, this Nevada law "is an enactment sometimes referred to as a 'stop and identify' statute," and 20 other states have enacted similar legislation. *Hiibel,* 124 S.Ct. at 2456 (citing state statutes). Notably, Michigan is not among these states.

articulated real and appreciable fear that his name would be used to incriminate him or that it would furnish a link in the chain of evidence needed to prosecute him. As best we can tell, petitioner refused to identify himself only because he thought his name was none of the officer's business. Even today, petitioner does not explain how the disclosure of his name could have been used against him in a criminal case. While we recognize petitioner's strong belief that he should not have to disclose his identity, the Fifth Amendment does not override the Nevada Legislature's judgment to the contrary absent a reasonable belief that the disclosure would tend to incriminate him.

The narrow scope of the disclosure requirement is also important. One's identity is, by definition, unique; yet it is, in another sense, a universal characteristic. Answering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances. In every criminal case, it is known and must be known who has been arrested and who is being tried. Even witnesses who plan to invoke the Fifth Amendment privilege answer when their names are called to take the stand. Still, a case may arise where there is a substantial allegation that furnishing identity at the time of a stop would have given the police a link in the chain of evidence needed to convict the individual of a separate offense. In that case, the

court can then consider whether the privilege applies, and, if the Fifth Amendment has been violated, what remedy must follow. We need not resolve those questions here.

*Hiibel,* 124 S.Ct. at 2461 (internal quotation marks and citations omitted).

■ In light of this Supreme Court ruling, Plaintiff here cannot claim any Fourth Amendment protection against the Defendant state troopers' requests that she identify herself during the course of their initial, limited investigative detention of her.[10] At the time of these requests, the troopers were investigating Plaintiff's apparent violation of a Michigan traffic law requiring that all front seat passengers wear safety belts. Although Plaintiff contends that she complied with this statute by wearing her seat belt while her boyfriend's pickup truck was in motion, and that she removed the belt only after the vehicle had been stopped by the Defendant troopers, Trooper Tuckey's personal observation of Plaintiff without her safety belt fastened surely provided a sufficient ground upon which to detain Plaintiff for the limited purpose of investigating this apparent violation.[11] In addition, *Hiibel* teaches that a request for identification is an appropriate part of such a *Terry* stop. Under *Hiibel,* then, the Fourth Amendment does not provide a shield against an otherwise lawful demand for identification during the course of a valid *Terry* stop.

**10.** A Fifth Amendment claim might fare better here than in *Hiibel,* where it appears that the production of Plaintiff's driver's license by her boyfriend led the Defendant troopers to discover that Plaintiff was 18 years old, which in turn gave rise to the belief that Plaintiff might have violated the Michigan prohibition against consumption of alcohol by minors. For the reasons discussed below, however, the Court need not address any such Fifth Amendment claim at this juncture.

**11.** The Court further observes that Plaintiff might well be estopped from challenging the factual basis for this safety belt infraction, where she apparently paid a fine imposed as a result of this civil citation, and where she did not successfully challenge the basis for this citation during the course of the state court proceedings.

■ In any event, even if *Hiibel* had been decided differently, Defendants correctly point out that they would be protected by the doctrine of qualified immunity against any claimed violation of Plaintiff's alleged right to refuse to identify herself. Under this doctrine, of course, a defendant police officer can be held liable under § 1983 for a federal constitutional violation only if "the violation involves clearly established constitutional rights of which a reasonable person would have known." *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir.2002) (internal quotation marks and citations omitted). Thus, the purported Fourth Amendment right discussed in *Hiibel* and claimed by Plaintiff here must not only have existed, but must have been "clearly established" at the time of Plaintiff's arrest.

Even if *Hiibel* did not foreclose Plaintiff's claim of a Fourth Amendment privilege against identifying herself, the pertinent Sixth Circuit precedent would defeat any contention that this right was "clearly established" at the time of Plaintiff's arrest. Prior to its decision in *Hiibel*, the Supreme Court had expressly left open the question whether a suspect asked to identify himself during a *Terry* stop "can be arrested and prosecuted for refusal to answer." *Hiibel*, 124 S.Ct. at 2458. Because the Supreme Court had not yet addressed this issue, and because of "the lack of clear precedent from our circuit," the Sixth Circuit held, in a decision issued just three days after Plaintiff's arrest, that there was no "clearly established" Fourth Amendment right to refuse to provide identification during a lawful *Terry* stop. *See Risbridger v. Connelly*, 275 F.3d 565, 572 (6th Cir.2002).

In light of this ruling, the Sixth Circuit held that the defendant police officers in *Risbridger* were shielded by qualified immunity against a claim that they had unlawfully arrested the plaintiff for hindering or obstructing an officer in the discharge of his duties. In that case, the plaintiff was arrested and charged with violating a municipal ordinance after he refused to comply with a request to produce identification during the defendant officers' investigation of a suspected assault and battery. The Sixth Circuit observed that the municipal ordinance was "presumptively valid," found that the defendant officers had probable cause to believe that the plaintiff had violated this ordinance by refusing a request for identification, and concluded that an arrest under these circumstances did not violate a "clearly established" Fourth Amendment right "to refuse to provide identification during a valid *Terry* stop." *Risbridger*, 275 F.3d at 572.

This contemporaneous Sixth Circuit decision plainly settles any question in this case as to whether Plaintiff had a "clearly established" right to refuse the Defendant troopers' requests for identification as they investigated Plaintiff's apparent safety belt infraction. Within days after Plaintiff was arrested, the Sixth Circuit held that any such right was not "clearly established" for purposes of a court's qualified immunity analysis. As a result, Defendants here are entitled to qualified immunity against any possible liability arising from their abridgment of Plaintiff's purported right to refuse a request for identification during the course of Defendants' limited investigative detention of her.

**C. The Present Record Fails to Establish Defendants' Entitlement to Qualified Immunity on Plaintiff's Claim of an Unlawful Arrest Without Probable Cause.**

■ To read Defendants' motion and accompanying brief, one might conclude that the foregoing analysis is dispositive, and that Plaintiff's Fourth Amendment claim of wrongful arrest is defeated by the

combined weight of the rulings in *Hiibel* and *Risbridger*.[12] Yet, this overlooks an essential factual predicate of these decisions—specifically, that the suspects in both cases were arrested and prosecuted under state or local laws that were construed as criminalizing their refusal to produce identification during the course of a *Terry* stop. As the Supreme Court emphasized in *Hiibel*, "the Fourth Amendment itself cannot require a suspect to answer questions," *Hiibel*, 124 S.Ct. at 2459, and any such obligation instead must derive from some independent legal source. Absent this necessary predicate— which, as discussed below, the Court finds is lacking here—an arrest of an individual who refuses to identify herself cannot be justified as based upon the requisite probable cause to believe that the individual has engaged or is about to engage in criminal activity.

Under core Fourth Amendment principles, of course, the government's seizure of a person must be "reasonable," U.S. Const. amend. IV, and a seizure that rises to the level of an arrest must be supported by probable cause. *See Kaupp v. Texas*, 538 U.S. 626, 123 S.Ct. 1843, 1846, 155 L.Ed.2d 814 (2003); *Michigan v. DeFillippo*, 443 U.S. 31, 36–37, 99 S.Ct. 2627, 2631–32, 61 L.Ed.2d 343 (1979). The Supreme Court "repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown,

that the suspect has committed, is committing, or is about to commit an offense." *DeFillippo*, 443 U.S. at 37, 99 S.Ct. at 2632. Moreover, "[w]hether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." *DeFillippo*, 443 U.S. at 36, 99 S.Ct. at 2631.

■ In this case, Defendants acknowledge that Plaintiff was placed under arrest, and not merely detained in a more limited fashion, when she was handcuffed and placed in the back of the Michigan State Police patrol car following her refusal to respond to Trooper Tuckey's repeated requests that she identify herself. At this point, Trooper Tuckey had personally observed Plaintiff's apparent violation of Michigan's safety belt law, and had personally witnessed her refusal to give her name or produce identification despite the trooper's repeated inquiries.[13] Regarding the former, a violation of Michigan's safety belt law is deemed a "civil infraction," Mich. Comp. Laws § 257.710e(7), and Defendants have not cited any authority for the proposition that the police are authorized to make an arrest for such an infraction. Thus, Plaintiff's arrest must be justified, if at all, by her refusal to respond to Trooper Tuckey's requests that she identify herself.

■ At the time, Plaintiff's arrest was justified as based upon her alleged violation of Michigan's "resisting and obstructing" statute, which provided at the time:

---

**12.** Indeed, a review of Plaintiff's cursory response to Defendants' motion might lead to the same conclusion, as she largely fails to address Defendants' challenge to her claim of wrongful arrest, and instead focuses solely upon the claim that Defendants illegally searched her purse.

**13.** Significantly, Trooper Tuckey lacked knowledge at this point of any of the factual

predicates for the subsequent charge that Plaintiff was a minor who had unlawfully consumed alcohol. The trooper had not yet observed Plaintiff's bloodshot eyes, had not yet been told by Plaintiff's boyfriend that she had been drinking that evening, and had not yet obtained Plaintiff's driver's license showing that she was under 21 years of age.

Any person who shall knowingly and wilfully ... obstruct, resist, oppose, assault, beat or wound any ... officer[ ], or any other person or persons authorized by law to maintain and preserve the peace, in their lawful acts, attempts and efforts to maintain, preserve and keep the peace, shall be guilty of a misdemeanor, punishable by imprisonment in the state prison not more than 2 years, or by a fine of not more than 1,000 dollars.

Mich. Comp. Laws § 750.479 (2000).[14] In the subsequent criminal complaint charging Plaintiff with violating this statute, it was alleged that Plaintiff obstructed Trooper Tuckey as he was engaged in an effort to "maintain, preserve and keep the peace" by "attempting to obtain identification" from Plaintiff. (Defendants' Motion, Ex. 7, Criminal Complaint.)

As observed in the state district judge's opinion dismissing this charge, the Michigan Supreme Court had construed this "resisting and obstructing" statute just a few months before Plaintiff's arrest. In *People v. Vasquez*, 465 Mich. 83, 631 N.W.2d 711 (2001), a police officer found the defendant urinating on the front lawn of a private residence, and the defendant admitted to the officer that he had been drinking. Suspecting that the defendant was an intoxicated minor, the officer asked his name and age, and the defendant responded that he was "John Wesley Chippeway" and that he was 16 years old. In fact, the defendant's true name was Mark John Vasquez, Jr., and he was 17 years old. The officer arrested the defendant for being a minor in possession of alcohol, and the prosecutor subsequently charged him both with this offense and with resisting and obstructing an officer in violation of Mich. Comp. Laws § 750.479. The trial court dismissed this latter "resisting and obstructing" charge, and the Michigan Supreme Court affirmed.

In so ruling, the Court first held that the arresting officer was engaged in an effort to "keep the peace" within the meaning of the "resisting and obstructing" statute when he questioned the defendant about his name and age. *Vasquez*, 631 N.W.2d at 715. Nonetheless, the Court found that the defendant had not "obstructed" this effort, reasoning that the statute's reach was limited to actual or threatened *physical* interference with a police officer's performance of his duties:

In the present case, the statute uses the word "obstruct" as part of a list containing five other words, namely, "resist, oppose, assault, beat [and] wound." The meaning of the word "obstruct" should be determined in this particular context, and be given a meaning logically related to the five surrounding words of the statute. "Resist" is defined as "to withstand, strive against, or oppose." "Resistance" is additional defined as "the opposition offered by one thing, force, etc." "Oppose" is defined as "to act against or furnish resistance to; combat." "Assault" is defined as "a sudden violent attack; onslaught." "Beat" is defined as "to strike forcefully and repeatedly; ... to hit repeatedly as to cause painful injury." "Wound" is defined as "to inflict a wound upon; injure; hurt." Each of these words, when read together, clearly implies an element of threatened or actual *physical* interference.

The accompanying term "obstruct" is susceptible to several potential meanings. "Obstruct" is defined as: "1. to block or close up with an obstacle. 2. to hinder, interrupt, or delay the passage, progress, course, etc. of 3. to block from

---

14. This statute has since been amended, but these amendments took effect in July of 2002, several months after the incident at issue here.

sight; be in the way of (a view, passage, etc.)." Accordingly, we understand the dissent's definition of "obstruct," which defines it as including both physical and non-physical conduct. Although we understand that "obstruct" can be defined in such a manner, *when read in context,* we believe that the more reasonable interpretation is one that communicates an actual, or a threat of, physical interference.

The words "assault, beat, or wound" necessarily contain an element of violence; whereas, the words "obstruct, resist [or] oppose" may, but do not necessarily, contain an element of violence. For example, one cannot "assault, beat, or wound" an officer without being violent; however, one can "obstruct, resist, [or] oppose" an officer without necessarily being violent. What this leads us to believe is that when the Legislature used these six words together, it intended to proscribe both violent and nonviolent physical interference; physical interference being the only element common to all six words. Therefore, by grouping these six words together as part of a single type of prohibited conduct, the Legislature has demonstrated a purpose of proscribing conduct amounting to actual or threatened physical interference. In this case, defendant's conduct did not constitute threatened or actual physical interference. Defendant instead lied to the officer about his name and age. While certainly not laudatory, defendant's conduct did not physically interfere with or threaten to physically interfere with the officer.

*Vasquez,* 631 N.W.2d at 715–17 (Markman, J., plurality opinion) (citations and footnotes omitted).[15]

Notably, the plurality expressed concern that the broader reading of "obstruct" urged by the dissent would lead to the prosecution of those who merely refused to answer a police officer's inquiry:

> The dissent asserts "[w]hen asked to provide his name and age, defendant had two lawful choices: he could have answered truthfully or exercised his constitutional right not to answer at all. Instead, defendant chose to lie. By doing so, he impeded the officer's investigation by creating a nonphysical obstacle to the officer's attempt to gather accurate information." Under the dissent's reasoning, if defendant had refused to answer *at all,* he could also have been charged under the "resisting and obstructing" statute. If defendant had refused to answer, this would have also "impeded the officer's investigation by creating a nonphysical obstacle to the officer's attempt to gather accurate information." However, one cannot be compelled to answer questions posed by a police officer. Therefore, one cannot be prosecuted for "obstructing" a police officer on the basis of one's refusal to answer questions.

*Vasquez,* 631 N.W.2d at 717 n. 3 (Markman, J., plurality opinion) (citations omitted). In positing a "constitutional right not to answer," however, the plurality relied in part upon the District Court ruling that was reversed by the Sixth Circuit in *Risbridger, supra,* and in part upon the U.S. Supreme Court's observation in dicta that "while the police have the right to

---

**15.** Although the above-quoted passage is from a plurality opinion, Justice Kelly agreed in a separate opinion that Michigan's "resisting and obstructing" statute prohibits only actual or threatened physical interference with a po-

lice officer's performance of his official duties, and that "[m]ere lies are insufficient to trigger a violation." *See Vasquez,* 631 N.W.2d at 728–29 (Kelly, J.).

request citizens to answer voluntarily questions concerning unsolved crimes they have no right to compel them to answer." *Davis v. Mississippi,* 394 U.S. 721, 727 n. 6, 89 S.Ct. 1394, 1397 n. 6, 22 L.Ed.2d 676 (1969). In light of *Hiibel,* of course, the plurality's concern about an unconstitutionally broad reading of Michigan's "resisting and obstructing" statute is no longer well-founded.

Nonetheless, this does not call into question the controlling nature of *Vasquez* as a definitive construction of a Michigan statute by the state's highest court. Rather, this Court readily concludes, as did the state district court in dismissing the underlying criminal charge against Plaintiff, that Plaintiff's mere refusal to identify herself in response to Trooper Tuckey's inquiries did not constitute the sort of actual or threatened physical interference that is necessary under *Vasquez* to trigger arrest and prosecution under Michigan's "resisting and obstructing" statute. The record does not indicate that Plaintiff physically resisted the trooper's inquiries or her detention in any way, or that she threatened any sort of violence or physical resistance in response to Trooper Tuckey's demands that she identify herself and statements that she would be arrested if she refused to comply. Instead, she obstructed Trooper Tuckey's investigative efforts solely through the nonphysical, wholly verbal acts of refusing to cooperate and insisting that she had no obligation to do so. Thus, as acknowledged by defense counsel at the March 10, 2005 hearing, and then again in Defendants' March 21, 2005

supplemental brief, Trooper Tuckey "was not authorized to arrest Plaintiff for 'resisting and obstructing' under [Mich. Comp. Laws] § 750.479, as the law existed at the time." (Defendants' 3/21/2005 Suppl. Br. at 2.)

This leaves only the question whether there was some *other* basis under Michigan law for Plaintiff's arrest. As noted earlier, Trooper Tuckey's reasonable belief that Plaintiff had committed a safety belt infraction does not appear to provide a sufficient ground for a full arrest, and Defendants have not argued otherwise. Moreover, unlike the Nevada law upheld in *Hiibel,* the Michigan Legislature has not enacted a "stop and identify" statute that would require an individual to disclose his identity to the police during the course of a lawful *Terry* stop.[16]

■■■ Nonetheless, Defendants suggested for the first time at oral argument that Plaintiff's arrest might be justified by resort to a different Michigan statute that, at the time of the arrest, provided as follows:

> Any person who shall in any manner disguise himself, with intent to obstruct the due execution of the law, or with intent to intimidate, hinder or interrupt any officer or any other person, in the legal performance of his duty, or the exercise of his rights under the constitution and laws of this state, whether such intent be effected or not, shall be guilty of a misdemeanor, punishable by imprisonment in the county jail not more than

16. Michigan law does dictate that a driver must keep his or her driver's license "in his or her immediate possession at all times when operating a motor vehicle," and that he or she must "display the same upon demand of any police officer, who shall identify himself or herself as such." Mich. Comp. Laws § 257.311. In addition, it appears that Michigan law authorizes the arrest of a driver who fails to maintain his license in his immediate possession or produce it upon a police officer's request. *See* Mich. Comp. Laws § 257.727(d); *People v. McFadden,* 31 Mich. App. 512, 188 N.W.2d 141, 143 (1971). These statutes are unavailing to Defendants here, however, because Plaintiff was not operating a motor vehicle at the time of her arrest, but was merely a passenger.

1 year or by fine of not more than 500 dollars.

Mich. Comp. Laws § 750.217.[17] In their supplemental brief, Defendants candidly "acknowledge that, at first blush, [this statute] does not appear applicable to the facts of this case because Plaintiff did not 'disguise' herself from [Trooper] Tuckey when she refused to identify herself to him." (Defendants' 3/21/2005 Suppl. Br. at 3.) Yet, in the purported absence of any controlling Michigan court precedent, Defendants contend that the statute's language would permit the reasonable construction that a person "disguises" himself by refusing a police officer's request for identification.

As Defendants themselves recognize, however, the Michigan courts **have** construed the "disguise" language of § 750.217, and in a way that clearly precludes the statute's application here. Specifically, in the lone published decision issued prior to Plaintiff's arrest, the Michigan Court of Appeals held that this statute prohibits only the **physical** concealment of one's identity, as opposed to "verbal deception." *People v. Jones,* 142 Mich.App. 819, 371 N.W.2d 459, 461 (1985). In that case, the defendant had given a fictitious name to a police officer, and a state district judge had dismissed a criminal charge brought against the defendant under § 750.217. In affirming this ruling, the Michigan Court of Appeals stated:

In the present case, the issue very simply is whether defendant's giving of a false or fictitious name to a police officer constitutes obstruction by disguise under [Mich. Comp. Laws] § 750.217.

The plain meaning and ordinary usage of "disguise" includes the element of *physical* concealment. To the ordinary person, "disguise" is defined as a false appearance or the physical misrepresentation of one's identity. The commonsense interpretation of the word "disguise" precludes inclusion of verbal deception.

Interpretation of [Mich. Comp. Laws] § 750.217 to include the giving of a false or fictitious name violates the principles regarding the strict construction of penal statutes. Criminal statutes must be strictly construed, and doubtful conduct should be found not criminal. Where there is doubt as to whether conduct or actions fall within the purview of the statute, the matter should be resolved in favor of the defendant.

In the present case, "disguise" admits of more than one meaning. The word as used in the statute is ambiguous, and it is not clear whether giving a false or fictitious name constitutes a disguise within the meaning of the statute. Applying the principle of strict construction of penal statutes, the doubt as to whether defendant's actions are criminal

---

17. Plaintiff, of course, was neither arrested nor charged under this statute. Yet, as the Supreme Court recently affirmed, the probable cause inquiry in this case is governed by a purely objective standard, and depends solely "upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford,* —— U.S. ——, ——, 125 S.Ct. 588, 593, 160 L.Ed.2d 537 (2004). Thus, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause," and the officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." —— U.S. at —— ——, 125 S.Ct. at 593–94. Rather, "[t]hose are *lawfully* arrested whom the facts known to the arresting officers give probable cause to arrest." —— U.S. at ——, 125 S.Ct. at 594. Consequently, it is enough here that Defendants can identify *any* law that would have authorized Plaintiff's arrest under the facts known to the Defendant troopers at the time.

should be resolved in his favor and the actions should be found not criminal. *Jones*, 371 N.W.2d at 461.

In light of this Michigan court decision, the Court sees little distinction between Defendants' appeals to the "resisting and obstructing" statute, Mich. Comp. Laws § 750.479, and the "obstruction by disguise" statute, Mich. Comp. Laws § 750.217. In particular, both of these enactments have been construed by the Michigan courts as requiring *physical*, as opposed to *verbal*, interference or deception. Just as Defendants acknowledge that Plaintiff did not violate § 750.479 as this statute was construed in *Vasquez*, it seems equally evident that Plaintiff did not violate § 750.217 as this enactment was construed in *Jones*—she did not, after all, engage in any sort of "physical concealment" merely by refusing to identify herself. The only apparent distinction, then, is that the former statute was interpreted by Michigan's highest court, while the latter has been construed only by the Michi-

gan Court of Appeals. This Court, however, is equally bound to follow *Vasquez* and *Jones* as to questions of Michigan law, at least absent "persuasive data that the highest court of the state would decide otherwise" on the issues addressed by the intermediate appellate court. *See Ziebart International Corp. v. CNA Insurance Cos.*, 78 F.3d 245, 250–51 (6th Cir.1996) (internal quotation marks and citations omitted). Defendants have not suggested any reason to believe that the Michigan Supreme Court would disagree with *Jones*'s reading of § 750.217.[18]

Nor can the Court accept Defendants' contention that, in light of the "ambiguity" in § 750.217 as noted in *Jones*, a police officer could not reasonably have known that Plaintiff's arrest under this statute would violate "clearly established law." [19] As an initial matter, the Court again fails to discern how *Jones* might be distinguishable from *Vasquez* in this regard. In both cases, the courts acknowledged that the relevant statutory terms—"obstruct" in

---

**18.** Indeed, as noted in Defendants' supplemental brief, the Michigan Supreme Court recently passed on the opportunity to construe this statute, and instead remanded a case to the Michigan Court of Appeals "to consider the issues whether the obstruction by disguise statute ... applies only to physical disguise and whether providing a false or fictitious name to a police officer is conduct that comes within the purview of the statute." *People v. Jackson*, 467 Mich. 939, 655 N.W.2d 229, 229–30 (2003). The decision of the Michigan Court of Appeals on remand is discussed below.

Just as significantly, the plurality and the dissent alike seemingly agreed in *Vasquez* that the defendant's conduct in that case—lying to the police about his age and identity—could not have supported a criminal charge under Mich. Comp. Laws § 750.217. *See Vasquez*, 631 N.W.2d at 719 n. 8 (Markman, J., plurality opinion) (expressly agreeing with the dissent that § 750.217 was "inapplicable in this case"); 631 N.W.2d at 732 (Corrigan, C.J., dissenting) (observing that this statute was

"arguably inapplicable because it has been construed to apply only to situations involving physical concealment," and citing *Jones* for this proposition). If anything, then, *Vasquez* seemingly indicates that Michigan's highest court would uphold the ruling in *Jones*.

**19.** Under the circumstances presented here, the Court need not decide the potentially complex and difficult question of precisely how a state court decision on a matter of state law—or, alternatively, the absence of such a decision, or inconsistent decisions on the same issue—should factor into the "clearly established" prong of the qualified immunity inquiry. Here, the state courts are uniform in their views on the pertinent statutes, because there is only *one* such decision bearing upon the proper construction of each of these two statutes. The Court assumes, without deciding, that it is appropriate to consider these rulings, along with the text of the underlying statutes themselves, in determining whether Plaintiff's arrest violated a "clearly established" Fourth Amendment right to be arrested only upon probable cause.

*Vasquez,* "disguise" in *Jones*—were "susceptible to several potential meanings," *Vasquez,* 631 N.W.2d at 716, or "admit[ted] of more than one meaning," *Jones,* 371 N.W.2d at 461. Yet, as a result of the courts' rulings in those two cases, entailing analogous exercises in statutory construction, it was equally possible for the Defendant troopers to ascertain whether, at the time of Plaintiff's arrest, her conduct violated either Mich. Comp. Laws § 750.479 or Mich. Comp. Laws § 750.217. In both cases, a controlling Michigan court decision answered this inquiry in the negative.

In their effort to show that an ambiguity remained lurking in § 750.217 at the time of Plaintiff's arrest despite the ruling in *Jones,* Defendants point to the recent Michigan Court of Appeals decision on remand in *People v. Jackson,* 262 Mich.App. 669, 686 N.W.2d 810 (2004). As noted, the Michigan Supreme Court expressly directed the Court of Appeals to consider whether § 750.217 prohibits only physical concealment, or also proscribes giving a false or fictitious name to the police. Upon undertaking this inquiry, the Court of Appeals reaffirmed its decision in *Jones* "that the plain meaning and ordinary usage of 'disguise' includes the element of physical concealment." *Jackson,* 686 N.W.2d at 813. In so ruling, the Court canvassed the several dictionary definitions of "disguise," and also looked to decisions from other states involving similar statutes. The Court declined, however, to invoke the "rule of strict construction" relied upon in *Jones,* noting that this rule had been abrogated by the Michigan Legislature and the courts. *Jackson,* 686 N.W.2d at 813 & n. 4.

The substantive ruling in *Jackson,* therefore, is wholly unavailing to Defendants here, as it merely confirms the earlier ruling of the Michigan Court of Appeals in *Jones.* Nonetheless, Defendants suggest that *Jackson* represents the first and

only statement of Michigan's "clearly established law" as to the proper meaning of § 750.217, presumably because *Jones* merely noted an ambiguity in the statute and resolved it using a now-disfavored rule of strict construction, while the ruling in *Jackson* followed "a thorough discussion of statutory interpretation and the various possible definitions of the term 'disguise.'" (Defendants' 3/21/2005 Suppl. Br. at 4.)

This Court is unaware of any authority, however, for the proposition that a court decision constitutes "clearly established law" only if it is persuasive, thorough in its analysis, carefully reasoned, or otherwise meets some (unspecified) standard of quality. To the contrary, the "clearly established" prong of the qualified immunity inquiry is intended to shield a police officer from liability if "the law did not put the officer on notice that his conduct would be clearly unlawful," *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001), or if the unlawfulness of his conduct was not "apparent" in light of "pre-existing law," *Burchett,* 310 F.3d at 942 (internal quotation marks and citations omitted). This inquiry would be considerably complicated, and a police officer's task made much more difficult, if the officer were required to determine that the decisions in *Vasquez* and *Jackson,* on one hand, represent controlling interpretations of a Michigan statute, while the ruling in *Jones,* on the other hand, does not. While Defendants presumably would be entitled to assert a defense of good faith if they acted in accordance with a Michigan court ruling that was subsequently overturned or a state statute that was later invalidated, *see, e.g., DeFillippo,* 443 U.S. at 37–38, 99 S.Ct. at 2632; *Pierson v. Ray,* 386 U.S. 547, 555–57, 87 S.Ct. 1213, 1218–19, 18 L.Ed.2d 288 (1967), the pertinent Michigan court decisions in this case uniformly hold that Plaintiff's conduct did not run afoul of either of the statutes cited by Defendants.

Finally, the Court notes that any ambiguity recognized in *Jones* is wholly unavailing to Defendants here. In both *Jones* and *Jackson*, the Michigan Court of Appeals considered whether a defendant violated the "obstruction by disguise" statute by giving a false name to the police. The courts in both cases, therefore, were called upon to decide whether purely verbal deception, unaccompanied by physical concealment, met the statutory definition of "disguise." Notably, all of the various dictionary definitions cited in *Jackson*, 686 N.W.2d at 813–14, as well as those offered in Defendants' supplemental brief, (*see* Defendants' 3/21/2005 Suppl. Br. at 3), entail some sort of affirmative effort at concealment, whether through misrepresentation, dissemblance, or a change in physical appearance. This Court simply fails to see how any of these definitions would reach Plaintiff's mere refusal to identify herself to the Defendant troopers, absent some affirmative effort to misrepresent her true identity.

▌ Consequently, while Plaintiff is perhaps not to be congratulated for her stubborn refusal to comply with Trooper Tuckey's simple request that she identify herself, and while such a refusal surely hinders a police officer's legitimate efforts to carry out his lawful duties, Defendants and the Court alike are bound by the determination of the Michigan Legislature—at least to this point, and at least as its enactments have been construed by the Michigan courts to date—that such conduct does not warrant arrest or criminal prosecution.[20] It follows that Defendants are not entitled to summary judgment in their favor on Plaintiff's claim that she was wrongfully arrested without probable cause in violation of the Fourth Amendment.[21]

---

20. As should be evident from this Opinion, the Court believes, as a matter of public policy and effective law enforcement practice, that police officers should be authorized to do precisely what Trooper Tuckey did in this case: insist that an individual identify himself or herself in the course of a lawful *Terry* stop. Unfortunately, this is not the present state of the law in Michigan, as much as officers—and, perhaps, judges—might wish it to be. Any change in this state of affairs, of course, must come from the policy branches of our State Government, not the courts—and particularly not a federal court presiding over a federal civil rights case. Indeed, because this is a question of state law, it would be particularly inappropriate for this Court to interpret state statutes inconsistently with the decisions of the Michigan courts on the subject.

That said, for whatever it might be worth, the Court urges the Michigan Legislature to consider joining the 21 other states that have enacted "stop and identify" statutes of the sort upheld by the Supreme Court in *Hiibel*. Such an enactment, in the Court's view, would help to deter frustrating encounters of the sort experienced by the Defendant troopers here.

21. As noted earlier, Defendants' summary judgment motion rests in part upon the defense of qualified immunity. To the extent that the foregoing analysis does not separately address this defense to Plaintiff's Fourth Amendment claim of wrongful arrest, the Court finds that Defendants are not shielded by qualified immunity under the present record. Plainly, the right to be arrested only upon probable cause was clearly established at the time of Plaintiff's arrest. Moreover, the state laws cited as providing a basis for Plaintiff's arrest, the "resisting and obstructing" and "obstruction by disguise" statutes, had been definitely construed by the Michigan courts *before* this arrest as not reaching purely verbal efforts at obstruction or deception or mere refusals to answer a police officer's inquiries. Thus, it cannot be said here that the underlying state-law basis for an arrest appeared valid at the time, and was only subsequently revealed to be invalid. *Compare De-Fillippo*, 443 U.S. at 37–38, 99 S.Ct. at 2632 (upholding the legality of an arrest under a City of Detroit ordinance that subsequently was declared unconstitutional).

**D. Defendants Are Not Entitled to Qualified Immunity on Plaintiff's Fourth Amendment Claim Arising from the Retrieval of Her Driver's License from Her Purse.**

As the final argument in support of their motion, Defendants contend that Plaintiff's claim of an unlawful search of her purse is defeated by the absence of governmental action in retrieving her driver's license from her purse. Alternatively, Defendants assert that Plaintiff's boyfriend, Aaron Gruner, voluntarily consented to this search, and that he had the authority to do so. The Court readily concludes that neither of these contentions can be accepted as a matter of law under the present record.

 Regarding Defendants' first argument—namely, that Gruner, and not Trooper Tuckey, carried out the search of Plaintiff's purse—it is true that the Fourth Amendment "proscribes only governmental action and does not apply to a search or seizure, even an unreasonable one, conducted by a private individual not acting as an agent of the government." *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir.), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985). Moreover, "[a] person will not be acting as a police agent merely because there was some antecedent contact between that person and the police." *Lambert*, 771 F.2d at 89. Rather, two elements must be shown in order to treat ostensibly private action as a state-sponsored search: (1) the police must have instigated, encouraged, or participated in the search; and (2) the private individual must have engaged in the search with the intent of assisting the police. *Lambert*, 771 F.2d at 89. Regarding this latter element of intent, the Sixth Circuit has explained that a private party is not an agent of the government where "the intent of the private party conducting the search is entirely independent of the govern-

ment's intent to collect evidence for use in a criminal prosecution." *United States v. Howard*, 752 F.2d 220, 227 (6th Cir.), *vacated on other grounds*, 770 F.2d 57 (6th Cir.1985); *see also United States v. Foley*, 23 F.3d 408, 1994 WL 144445, at *2 (6th Cir. Apr.21, 1994) ("[I]f the intent of the private party conducting the search is independent of the official desire to collect evidence in a criminal proceeding, then the private party is not acting as a state agent."), *cert. denied*, 513 U.S. 938, 115 S.Ct. 340, 130 L.Ed.2d 297 (1994).

The record in this case does not resolve these two issues in Defendants' favor as a matter of law. First, Gruner's deposition testimony clearly would permit the inference that Trooper Tuckey at least encouraged, if not ordered, Gruner to retrieve Plaintiff's driver's license from his vehicle. Gruner testified, for example, that the trooper "told me to go get" Plaintiff's license, that "I was not asked nice," and that Trooper Tuckey "was starting to get angry" at the time he gave this instruction. (*See* Gruner Dep. at 32–33.) Next, it cannot be said as a matter of law that Gruner acted with an intent entirely independent of Trooper Tuckey's desire to advance his investigation. To the contrary, Gruner testified that he retrieved Plaintiff's license because "I figured that would help" the situation, and because he "felt threatened" in light of Trooper Tuckey's decision to place Plaintiff in the Michigan State Police patrol car. (*Id.* at 59.) Indeed, the record fails to suggest any independent reason why Gruner would have retrieved Plaintiff's license from her purse, apart from his desire to alleviate the situation and get himself and Plaintiff out of their predicament by assisting in Trooper Tuckey's investigation. This evidence falls well short of establishing as a matter of law that the trooper obtained Plaintiff's driver's license through a wholly "private" search.

Nor does the record sustain Defendants' theory of "consent" as a matter of law. First, in order to establish voluntary consent to a search, the record must demonstrate "that the consent was unequivocal, specific, intelligently given and not influenced by any duress or coercion." *United States v. Salvo*, 133 F.3d 943, 953 (6th Cir.1998). As explained above, Gruner's testimony does not unequivocally demonstrate his voluntary consent, but instead is susceptible of the inference, at least, that he acted in response to Trooper Tuckey's order that he retrieve Plaintiff's driver's license. Given that Plaintiff already had been arrested for refusing to comply with the trooper's requests for identification, it would be reasonable to infer that Gruner experienced some degree of duress or coercion as he contemplated whether to carry out the trooper's instruction.

Next, and more importantly, Defendants fail to suggest why Gruner's consent, even if freely and voluntarily given, should be deemed effective to permit a search of Plaintiff's purse. A search may properly rest upon the consent of either "the individual whose property is searched" or "a third party who possesses common authority over the premises." *Harajli v. Huron Township*, 365 F.3d 501, 506 (6th Cir.2004) (internal quotation marks and citation omitted). Moreover, "[e]ven if the third party does not in fact possess common authority over the premises, the search is still valid under the Fourth Amendment if the police officers *reasonably believed* that the third party had such authority." *Harajli*, 365 F.3d at 506 (internal quotation marks and citation omitted). Yet, "courts are understandably reluctant to approve third-party consent searches of an enclosed space in which the family member targeted for the search has clearly manifested an expectation of exclusivity." *United States v. Clutter*, 914 F.2d 775, 778 (6th Cir.1990). In addition, because this issue of apparent authority turns in part upon the "nature of the container" to be searched, "it is less reasonable for a police officer to believe that a third party has full access to a ... purse or a briefcase than, say, an open crate." *United States v. Basinski*, 226 F.3d 829, 834 (7th Cir.2000).

In light of these governing principles, the Court cannot conclude as a matter of law that Plaintiff's boyfriend possessed either actual or apparent authority to consent to the search of her purse. While Gruner presumably had the authority to consent to a search of the passenger compartment of his vehicle, the record is clear that Plaintiff's driver's license was not discovered out in the open in this compartment, but had to be retrieved from her purse. Nothing in the record would have provided any basis for the Defendant troopers to believe that Gruner had the authority to consent to a search of Plaintiff's purse. There is no evidence, for example, that Plaintiff treated her purse in a less exclusive or private fashion than a woman typically would, or that the contents of her purse were in any way publicly disclosed during the course of her encounter with the Defendant troopers.

Nonetheless, Defendants seek to place legal significance on the fact that Trooper Tuckey did not *know* that Plaintiff kept her driver's license in her purse. It follows, in Defendants' view, that the trooper reasonably could have *believed* that Plaintiff's boyfriend retrieved the license from an area of his vehicle where he was authorized to look. This argument, however, overlooks the arguably state-sponsored nature of Gruner's search of Plaintiff's purse. As explained earlier, a trier of fact permissibly could conclude that Gruner was acting as a state agent when he carried out this search. It surely follows that Trooper Tuckey is charged with the knowledge of

any facts known to Gruner, *see, e.g., Thacker v. City of Columbus,* 328 F.3d 244, 256 (6th Cir.2003) (holding that a Fourth Amendment inquiry turns upon the collective knowledge of the police), and that Gruner, as a state agent, could not exceed the authority possessed by any police officer in the same situation. Whatever Trooper Tuckey did or did not know, it is undisputed that *Gruner* knew, or at least discovered, that Plaintiff's license was in her purse, and not left out in the passenger compartment of his truck. Knowing this, and lacking any reasonable basis to believe that Gruner had the authority to consent to a search of Plaintiff's purse, a police officer in Trooper Tuckey's position could not reasonably have concluded that he possessed the authority to retrieve Plaintiff's driver's license from her purse, whether himself or through an agent.

More generally, Defendants' attempt to limit the focus to Trooper Tuckey's state of knowledge runs counter to the well-established principle that "the Fourth Amendment protects people, not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Consequently, "what [Plaintiff] seeks to preserve as private ... may be constitutionally protected," even if these items might be physically accessible to others. *Katz,* 389 U.S. at 351, 88 S.Ct. at 511. In this case, Defendants have failed to identify any action taken by Plaintiff that might have diminished the expectation of privacy she otherwise would have enjoyed in the contents of her purse. It is immaterial, in the Court's view, that the Defendant troopers did not expressly order the invasion of Plaintiff's constitutionally protected privacy interest, or perhaps even know that it had occurred. It is enough, for present purposes, that the record would support the conclusion that a state agent invaded this interest on Defendants' behalf.

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' August 31, 2004 Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, in accordance with the rulings in this Opinion and Order.